OLD DOMINION COPPER MINING AND SMELTING COMPANY
*vs.* ALBERT S. BIGELOW.

Suffolk.   December 7, 1904. — June 19, 1905.

Present: KNOWLTON, C. J., MORTON, LATHROP, BARKER, & LORING, JJ.

*Equity Pleading and Practice.   Corporation.   Equity Jurisdiction.*

An attempted demurrer to a part of a bill in equity may be treated as an assignment of a cause of demurrer to the whole bill.

A promoter stands in a fiduciary relation to a corporation formed by his promotion, and if he buys property personally with a view to selling it to the corporation and sells it to the corporation at an advance he is bound to disclose all material facts relating to the property, or to see that the corporation has adequate independent advice.

A corporation does not lose by acquiescence the right to avoid a purchase of property sold to it by its promoters in exchange for stock without a disclosure of material facts, if at the date of the directors' meeting at which the purchase was made the authorized capital stock was one hundred and fifty thousand shares, of which only forty shares had been issued and these were owned by the promoters, if the directors present at the meeting were the two promoters, their attorney and an employee, if at this meeting it was voted to buy the property in question for thirty thousand shares, to buy other property for one hundred thousand shares and to issue to the public twenty thousand shares, and if of the one hundred thousand shares twenty thousand went to the promoters for promotion services and expenses and eighty thousand to the persons who furnished the promoters with funds to buy the property sold by them to the corporation.

A bill in equity may be maintained by a corporation against one of its two promoters to compel, after rescission by the corporation, the restitution of the consideration received for property sold to it by the promoters at a large profit without a disclosure of material facts, although the title to the property conveyed to the corporation stood in the name of the other promoter who had a half interest in the contract, such other promoter being dead and his executors being residents of another State and not made parties to the suit.

In a suit in equity by a corporation against one of its two promoters to compel, after rescission by the corporation, the restitution of the consideration received for property sold to it by the promoters at a large profit without a disclosure of material facts, the plaintiff, if the property has remained unchanged, not only can offer to restore it and demand the return of the consideration, but also has the remedy of waiving its right to a return of the consideration and seeking damages for the equitable tort committed by the defendant while acting in a fiduciary relation, and on this ground *semble*, that either promoter is liable severally as well as the two jointly.

This court has jurisdiction in equity to compel the restitution of money taken in violation of a fiduciary duty.

In a bill in equity against one acting in a fiduciary relation to the plaintiff there is no inconsistency in a prayer for the rescission of a contract and a prayer for damages.

BILL IN EQUITY, filed October 7, 1902.

The following statement of the case is taken from the opinion of the court:

This cause came on to be heard on two demurrers. The defendant filed a demurrer to the whole bill, and what purported to be a demurrer to so much of the bill "as seeks to have the sale of certain parcels of real estate conveyed to the plaintiff by Leonard Lewisohn rescinded, and to have the defendant ordered to return to the plaintiff the consideration paid by the plaintiff for said conveyance." On the plaintiff's stipulating that in case the demurrers or either of them should be sustained on the merits, the bill, or so much thereof as the demurrers apply to, should be dismissed, the cause was reserved for the consideration of the full court.

The case stated in the bill, so far as material here, is in effect as follows. The defendant and one Lewisohn, at some time before March, 1895, formed the plan of buying the property of the Old Dominion Copper Company of the City of Baltimore (hereinafter spoken of as the Baltimore company), and four certain mining claims and a mill site standing in the name of one Keyser (hereinafter spoken of as the real estate here in question), with a view to reselling them at a profit to a corporation to be organized by them for that purpose. Their scheme was first to buy all the stock of the Baltimore company. Having got control of that company through their ownership of all of its capital stock, they were to organize a new company, and before the stock of the new company was issued and while it was entirely in their control as the organizers of it, they were

to sell to it the property of the Baltimore company and the real estate here in question, for a specified number of shares of the new company, the balance of shares in the capital stock of the new company being sold to the public to provide working capital and to build additions. All this was done. The plaintiff was the new corporation. The defendant and Lewisohn got the money with which to buy all shares in the capital stock of the Baltimore company from a syndicate (hereinafter called the Dominion Syndicate) which they organized for the purpose and to which they agreed to pay two dollars for every dollar paid into the syndicate treasury in case the scheme was a success, with a privilege given to the syndicate members of taking shares at par in the new corporation in place of money. Five-sevenths of the stock of the Baltimore company were bought of the executors of one Simpson, for a sum not more than $613,137.39; and the other two-sevenths, together with the real estate here in question, of one Keyser and "other persons to the plaintiff unknown," for a sum not exceeding $175,182.11; and thereupon the real estate here in question was conveyed to Lewisohn. These transactions were carried through on July 8, 1895. On the same eighth day of July, 1895, the plaintiff corporation was organized by seven persons employed by the defendant and Lewisohn for the purpose, apparently with a capital stock of $1,000, divided into forty shares of $25 each, which were issued to the incorporators but were in fact paid for by the defendant and Lewisohn. On July 9, 1895, the incorporators met, chose themselves directors, and increased the authorized capital stock from $1,000 to $3,750,000, composed of one hundred and fifty thousand shares of $25 each. At a meeting of the directors held on July 11, 1895, pursuant to instructions from the defendant, five directors resigned, and the defendant and Lewisohn, together with three members of the Dominion Syndicate, were appointed in their places. Thereupon the defendant and Lewisohn took their seats on the board. The other three new directors were not present. After these changes in the directorate, the directors present at the meeting were the defendant, Lewisohn, one Evarts, "the attorney employed by said defendant and said Leonard Lewisohn to attend to the incorporation of the plaintiff corporation and to carry out their said plan and conspiracy," and one Buffam, a person

" selected " and " employed " by the defendant and Lewisohn
" to act as director and assist them in carrying out said plan
and conspiracy." Thereupon the defendant through said Evarts
presented to the board an offer to sell to the plaintiff corpora-
tion the property of the Baltimore company for one hundred
thousand shares in its capital stock, and Lewisohn offered to
sell to the plaintiff corporation the real estate here in question
for thirty thousand shares in its capital stock. These offers
were accepted and the stock was in fact subsequently issued
in accordance therewith. Of the thirty thousand shares issued
for the real estate here in question the defendant received six-
teen thousand four hundred and ten, and Lewisohn thirteen
thousand five hundred and ninety. Of the one hundred thou-
sand shares issued for the property of the Baltimore company,
eighty thousand were issued to the syndicate, and the other
twenty thousand were issued to the defendant and Lewisohn for
their expenses and services. Of this twenty thousand the de-
fendant received ten thousand nine hundred and forty, and
Lewisohn nine thousand and sixty. It is alleged that at this
time the fair market value of the shares in the capital stock of
the plaintiff corporation was par, and " continued for a long
time thereafter to be of such or greater value."

The bill goes on to allege that no disclosure was made of the
profit made by the issue of the thirty thousand shares for the
real estate here in question to the persons who subscribed for
the twenty thousand shares issued for working capital, or to the
members of the syndicate to which the eighty thousand shares
were issued (except to the defendant and Lewisohn, members
thereof). It is alleged also that from July 11, 1895, to July 4,
1902, the plaintiff corporation was in effect in control of the de-
fendant and Lewisohn. Thereafter investigations were begun
which resulted in the filing of this bill on October 7, 1902. It
is alleged further that Lewisohn died on March 5, 1902, and at the
time of his death was a resident and citizen of the city of New
York; that the executors of his will are also residents and citi-
zens of the city of New York; that no executors or legal repre-
sentatives have been appointed or are within this Commonwealth;
that there is no property within the Commonwealth belonging
to said estate; and that it is impossible to get service within

this Commonwealth on the executors of the will of Lewisohn. It is also alleged that the real estate here in question, at the time of the sale to the plaintiff, was " of substantially no value, to wit, of a value not exceeding five thousand (5,000) dollars, and . . . [was] . . . known by said Lewisohn and by the defendant when " they acquired the same and when they offered to sell the same to the plaintiff, " to be of substantially no value "; and that said " property has since said conveyance remained undeveloped and is now in substantially the same condition that it was in at the time of the conveyance " to the plaintiff.

The plaintiff alleges that it " desires to rescind the sale " of said real estate, " and has offered to convey " it " to the defendant, or to such person as he may request, upon receiving from said defendant " said thirty thousand shares, " or if and in so far as said shares have been disposed of, upon said defendant's duly accounting therefor; but said defendant refused to make any such restitution or accounting." After alleging a continued readiness to convey, the bill concludes with a prayer that the court will declare the sale of the mining claims and of the mill site rescinded, and will direct the defendant to return the thirty thousand shares or, if and in so far as said shares are no longer in his control, to account to the plaintiff therefor, or, in the alternative, in case it is held that the sale is not rescinded and that the plaintiff is not entitled to rescind that sale, for damages. There is also a prayer for general relief.

It was stated at the bar that another bill had been brought for relief in respect of the issue of the one hundred thousand shares, and that the only relief here sought was in respect of the thirty thousand shares issued in payment for the real estate here in question.

The result of these transactions was that for the property for which the defendant and Lewisohn had paid not more than $788,319.50, the plaintiff corporation issued one hundred and thirty thousand shares of its capital stock having a market value of at least $3,250,000, a profit of at least $2,460,000. Of these one hundred and thirty thousand shares, eighty thousand (which were worth at least $2,000,000) went to the syndicate; twenty thousand (worth at least $500,000) went to the defendant and Lewisohn for services and expenses; and thirty thousand (worth

at least $750,000) went to the defendant and Lewisohn for the real estate here in question; and the balance, twenty thousand, to the public (apparently with the exception of the original forty shares issued to the incorporators and paid for by the defendant and Lewisohn).

*L. D. Brandeis & W. H. Dunbar*, for the plaintiff.

*A. Hemenway*, (*J. W. Farley* with him,) for the defendant.

LORING, J. [After the foregoing statement of the case.] The only question now before us is whether the plaintiff is entitled to any relief on these facts. If it is, it is not necessary to determine what that relief is. An attempt has been made to force a decision on the nature of the relief at this time by demurring " to so much of said bill as seeks to have the sale of certain parcels of real estate conveyed to the plaintiff by Leonard Lewisohn rescinded, and to have the defendant ordered to return to the plaintiff the consideration paid by the plaintiff for said conveyance." But there is no part of the bill which seeks rescission. This demurrer is not a demurrer to a part of the bill; it is to the whole bill so far as it seeks rescission. This so called demurrer to a part is in fact an assignment of causes of demurrer to the whole bill, and will be so treated.

The defendant has contended that on the facts stated in the bill no case is made out for relief in respect of thirty thousand shares issued for the four mining claims and the mill site.

It will be useful to get a clear conception of what is and what is not alleged in the bill, and of the rights of the parties in such a transaction as that here set forth.

It was settled by the recent case of *Hayward* v. *Leeson*, 176 Mass. 310, that a promoter of a corporation stands in a fiduciary relation to the corporation of which he is a promoter.

It is clear that on the facts stated the defendant was a promoter of the plaintiff corporation.

It is not alleged here that the defendant made any misrepresentation as to the price paid by himself and Lewisohn for the property resold to the plaintiff at an advance, as was the case in *Gluckstein* v. *Barnes*, [1900] A. C. 240; *S. C.* below, *sub nomine In re Olympia*, [1898] 2 Ch. 153; *Hichens* v. *Congreve*, 4 Sim. 420. Where one standing in a fiduciary relation makes such a misrepresentation it may well be that the purchaser can keep

the property and force the vendor to make good the representation by paying to him, the purchaser, the difference between what was in fact paid by the vendor and what he represented that he paid for it.

Further, the defendant is not liable here on the ground that the plaintiff corporation is entitled to the benefit of the original purchase of the real estate here in question, as a beneficiary is entitled where a person standing to him in a fiduciary capacity buys for himself and resells to him, the beneficiary, at a profit when he ought originally to have bought for the beneficiary. In such a case the purchaser can keep the property and charge the defendant with the difference in price. *Parker* v. *Nickerson,* 137 Mass. 487, 497.

When the defendant and Lewisohn bought this real estate they were under no obligation to make the purchase of it for the plaintiff corporation, which was not then in existence. Having bought the property at that time and paid for it with what as between them and the plaintiff corporation was their own money, they could have kept it or resold it to the plaintiff corporation or to anybody else, as they saw fit. The fact that the property was bought with a view to reselling it to a corporation to be organized for the purpose, and that that purpose was ultimately carried into effect, does not give to the corporation subsequently organized in execution of the original purpose a right to the benefit of the purchase. That was considered in *New Sombrero Phosphate Co.* v. *Erlanger,* 5 Ch. D. 73, 118, 119; and at still greater length in that case on appeal, *Erlanger* v. *New Sombrero Phosphate Co.* 3 App. Cas. 1218, by Lord Hatherley, at p. 1242, Lord O'Hagan, at p. 1255, and Lord Blackburn, at pp. 1267 and 1268. It is enough to say that we agree with what is there said. For a case where no relief was given because it was not made out that the company was entitled to the benefit of the original purchase, see *Ladywell Mining Co.* v. *Brookes,* 35 Ch. D. 400.

The situation then was this. The defendant and Lewisohn were, so far as this case goes, the absolute owners of the four mining claims and the mill site. We say the absolute owners so far as this case is concerned, because the rights of the Dominion Syndicate in this real estate, if any, are not here in question, and

therefore so far as this case is concerned their rights, if any, may be disregarded. Being the absolute owners of it, the defendant and Lewisohn could do with that property as they pleased,—let it lie idle, work it, or sell it, as they thought best, and if they determined to sell it they could sell it to any one they might choose. If they chose to sell it to a stranger they could make the sale at arm's length, they could ask any price they pleased, and were under no legal obligation to state what it had cost them. On the other hand, if they elected to make a sale of it to one standing to them in a fiduciary relation, they were under an obligation to make a full disclosure to the beneficiary of all the facts known to them material to the property and the purchase, or see to it that the fiduciary had adequate independent advice. That is an obligation resting upon every fiduciary who makes a sale of his own property to his beneficiary, no matter whether it is a case of trustee and *cestui que trust*, guardian and ward, solicitor and client, or promoter of a corporation and the corporation itself.

There is no pretence that in the transaction in question the plaintiff corporation was represented by an independent board.

The defendant has sought in the first place to distinguish the case at bar from *Hayward* v. *Leeson*, 176 Mass. 310, on the ground that in the prospectus in that case there was the false statement that the capital stock represented actual value, without inflation, while a substantial part of it had been issued to the defendants and their associates for nominal services. But that fact was not spoken of in the opinion as the ground of the decision. The opinion went on the broad ground mentioned above. This false representation was spoken of in connection with a contention on the part of those defendants that they were not liable because of a finding made by the Superior Court that the defendants did not conceal the transaction from the knowledge of future stockholders. The case of *New Sombrero Phosphate Co.* v. *Erlanger*, 5 Ch. D. 73; *S. C.* on appeal, *Erlanger* v. *New Sombrero Phosphate Co.* 3 App. Cas. 1218, is on all fours with the case at bar in this respect. In that case there was no misrepresentation.

In the second place the defendant contends that the corporation cannot complain because the facts were known to the four directors who took part in the purchase and to the holders of all

shares of capital stock of the corporation outstanding when the contract of purchase here in question was made, and because the purchase was acquiesced in by them.   Their contention is that this result follows because one buying shares from a shareholder who acquiesces is bound by the acquiescence of his vendor.   The four directors present at the directors' meeting when the real estate in question was sold by the defendant and Lewisohn to the plaintiff corporation for thirty thousand shares, were the defendant and Lewisohn, their attorney, and one Buffam, " a person selected by them and employed by them to act as director and assist them in carrying out said plan and conspiracy."   On the allegations of the bill the defendant and Lewisohn are to be treated as the owners of all the shares then outstanding, and therefore the transaction is to be taken to have been known to and acquiesced in by all the then stockholders.

It is proper to pause here and see just what this contention means.   When this contract was made on July 11, 1895, the authorized capital stock had just been increased from forty shares to one hundred and fifty thousand shares of $25 each, that is to say, from $1,000 to $3,750,000.   Of the authorized capital stock, only forty shares, or $1,000 had then been issued. As we have said, these forty shares are to be treated on the allegations of the bill as the property of the defendant and Lewisohn.   The scheme of the defendant and Lewisohn as to this capital stock of $3,750,000, divided into one hundred and fifty thousand shares, was to issue eighty thousand shares (or $2,000,000) to the syndicate, or sell them to the public for cash to provide $2,000,000 to be paid to the syndicate ; twenty thousand shares (or $500,000) to themselves for their services and expenses as promoters; twenty thousand shares (or $500,000) to the public for cash for working capital; and the balance, thirty thousand shares (or $750,000) to themselves for the real estate here in question.   And this scheme was carried out.   In carrying it out no disclosure was made to the persons who took the syndicate's eighty thousand shares (except those of the eighty thousand issued to the defendant and Lewisohn as members of the syndicate), nor to those who took the twenty thousand shares sold to the public for cash for working capital.   Of the eighty thousand issued to or for the syndicate it is alleged that

the defendant received four thousand. It is not alleged that any of this eighty thousand were issued to Lewisohn. The contention is that inasmuch as the defendant and Lewisohn owned all the forty shares of the corporation, amounting to $1,000, outstanding when the sale here in question was made by them to the corporation, the corporation is barred from complaining that a full disclosure of the material facts was not made by them to it.

Since the argument was made in the case now before us it has been decided by the Circuit Court of the United States for the Second Circuit in *Old Dominion Copper Mining Co.* v. *Lewisohn*, 136 Fed. Rep. 915, that this contention is correct. In that case a demurrer was sustained to a bill against the executors of Lewisohn, which is the counterpart of the bill now before us, on the ground that the point was concluded by two earlier cases, one in that court, *Foster* v. *Seymour*, 23 Fed. Rep. 65, and the other in the Court of Appeals in that Circuit. *McCracken* v. *Robison*, 57 Fed. Rep. 375.

*Foster* v. *Seymour*, 23 Fed. Rep. 65, was a case where the owners of a mine conveyed it to a corporation organized by themselves in payment for all its capital stock, to the par value of $10,000,000. The owners of the mine were the trustees of the corporation when the exchange was made. Afterwards this stock was sold on the market. The thing complained of in *Foster* v. *Seymour* was that the mine was in fact worth only $100,000. A stockholders' bill was brought in behalf of the corporation to make the trustees "account to the corporation for a fraudulent disposition of its capital stock." The statute under which the corporation was organized provided that stock could be paid for in property. It is to be observed of this case that the bill did not seek to set aside the purchase for a failure to disclose a material fact in selling the property of the company. The thing complained of was not that the property had been bought for $100,000 and sold for $10,000,000. It was that the mine in payment for which the whole capital stock of the corporation was issued was in fact worth only $100,000.

The other case on the authority of which *Old Dominion Copper Mining Co.* v. *Lewisohn* was decided (*McCracken* v. *Robison*, 57 Fed. Rep. 375) is a case where four men, including the defendant in error, Robison, by the expenditure of their own

moneys organized a corporation to build a specified railroad, subscribing for the proportion of stock required as a preliminary by the laws of Michigan, procured the right of way and local aid in the form of donations of land and money to the enterprise, and with such assistance and with their own moneys undertook to furnish the roadbed and cross ties for the whole road ready for laying the track and completing the superstructure.   They then caused the corporation to agree with the plaintiffs in error in consideration of their (the plaintiffs in error) agreeing to complete the road, to issue to them (the plaintiffs in error) all the capital stock and bonds of the corporation, the plaintiffs in error agreeing to pay the defendant in error individually one half the profit afterwards commuted by agreement to $150,000.   For this $150,000 this action was brought, and the plaintiffs in error set up in defence that the contract sued on was an illegal contract on which no action could be maintained in a court of law. Here the capital stock and bonds were issued to the plaintiffs in error for laying the track and completing the superstructure of a road of which the right of way, the roadbed, grading and cross ties had been paid for by the defendants in error and by the donations and not by the corporation or the plaintiffs in error. So long as the corporation did not complain of the transaction, there would seem to be no reason why an agreement by which the incorporators were to be reimbursed for money expended by them in building the road was not valid. .

In both *Foster* v. *Seymour* and *McCracken* v. *Robison* (in addition to what has been pointed out above) all the capital stock was issued to the directors and promoters who made the sale to the corporation complained of in payment for the property so sold.   In such a case the transaction complained of is acquiesced in not only by all those interested but by all who it is contemplated shall be interested in the corporation except as third persons should acquire the interest of some one or more of those persons.   Such third persons are bound by the acquiescence of their vendors, and such a corporation is bound by the acquiescence of all its stockholders.   See *In re Ambrose Lake Tin & Copper Mining Co.* 14 Ch. D. 390.   See also *In re Postage Stamp Automatic Delivery Co.* [1892] 3 Ch. 566.

It is hardly necessary to point out the difference between such

a case, where the scheme of the corporate organization does not contemplate there being any stockholders other than those who buy the stock issued in the transaction complained of, and a case like that now before us, where ninety-six thousand out of one hundred and fifty thousand shares are to be issued to persons to whom no disclosure was made.

Again, the case stated in the bill now before us does not come within the decision in *In re British Seamless Paper Box Co.* 17 Ch. D. 467, where all persons acquiesced who were to have an interest so far as the scheme went which the parties then had, and where there was a subsequent change made in the scheme in good faith by which other persons were brought in.

The case submitted to us for decision here by the defendant's demurrer to this bill is a case where (disregarding the forty shares subscribed for to organize the corporation) the whole capital stock was one hundred and fifty thousand shares, of which fifty-four thousand shares were to be issued to the promoters for services and for the sale of the land here in question, and the remaining ninety-six thousand were to be issued to persons to whom the facts of this sale were not disclosed.

The question arises whether in such a case the rule enforced in *Hayward* v. *Leeson*, 176 Mass. 310, applies.

In *Hayward* v. *Leeson* it was held by this court that a corporation was not barred in the recovery of secret profits made by promoters by the fact that the promoters owned all the stock of the corporation when the agreement was made to pay them the profits recovered in that case. The secret profits agreed upon, paid and recovered in that case were paid up shares of capital stock of the par value of $700,000 for services as promoters out of a capital of $3,000,000, the rest of which was subscribed to and paid for by the public in cash. To the cases cited in *Hayward* v. *Leeson* on this point, 176 Mass. at p. 320, should be added *Gluckstein* v. *Barnes*, [1900] A. C. 240, the decision of the House of Lords on appeal from *In re Olympia*, [1898] 2 Ch. 153, made after the opinion in *Hayward* v. *Leeson* was written.

The question which we have to decide here is whether the difference in the way in which this transaction was carried through leads to the opposite result. If in the case at bar the ninety-six thousand shares not issued to the promoters had been

offered to the public for cash to be used in buying the property of the old Baltimore company and for working capital, and had been taken by them, the case at bar would have come directly within the decision in *Hayward* v. *Leeson.*

We see no reason why the rule enforced in *Hayward* v. *Leeson* does not apply to the case stated in the bill now before us.

The defendant has insisted that the corporation is barred in this case because if it (the corporation) is allowed to recover in such a suit the purchasers of the fifty-four thousand shares issued to the defendant and Lewisohn would get their share of the sum recovered and to that extent the purchasers of these shares would not be bound by the acquiescence of their vendors.   That is true.   That was true in *Hayward* v. *Leeson.*   In that case the purchasers of the seven hundred and fifty thousand shares would have got their share of the sums recovered by the receiver in behalf of the corporation if there was any part of those sums left after the debts were paid.   The argument is an old one and was disposed of by Lord Justice James in *New Sombrero Phosphate Co.* v. *Erlanger,* 5 Ch. D. 73, 118, 119.   A corporation is not precluded from recovering for a fraud on it (the corporation) because the party committing the fraud is a stockholder.

Again, the corporation is not barred because when the agreement was made it acquiesced in the trade and it was then, from a legal point of view, fully born.   That was equally true in *Hayward* v. *Leeson* and the cases cited in that case.   The answer to that suggestion is that from a business point of view the agreement was not made to bind the corporation with a capital of $1,000 which was the corporation then in fact in existence, but to bind the corporation with a capital of $3,750,000.   It was to that corporation with a capital of $3,750,000 that a full disclosure ought to have been made, and to that corporation no disclosure ever was made.

On the case stated in this bill the defendant was a promoter of the plaintiff corporation ; being a promoter he stood in a fiduciary relation to it; on selling to the plaintiff the real estate here in question he was bound to disclose all facts known to him material in the sale since it was not independently represented ; the price at which the property recently had been bought with a view to reselling it to the plaintiff corporation was at any rate a

material fact which he was bound to disclose; the knowledge of the defendant and Lewisohn was not equivalent to a disclosure to the plaintiff corporation, although they owned all the stock of the plaintiff corporation outstanding at the time the sale was made; and although fifty-six thousand out of one hundred and fifty thousand shares of the capital stock ultimately issued were issued to them; the defendant violated the duty which he owed the plaintiff in not disclosing that fact; and for this reason the contract here in question was not binding on the plaintiff.

On the facts stated the property sold having remained unchanged, the contract came to an end on the plaintiff's electing to rescind and tendering a reconveyance of it back to the defendant.

The only question of importance left is whether this bill can be maintained in the absence of the executors of the will of Lewisohn, who has since died.

The fact that the legal title to the real estate here in question stood in Lewisohn's name is not fatal to the plaintiff's maintaining this bill. Had the defendant been the sole owner, the fact that the title stood in the name of a man of straw and the contract had been made with the man of straw would not have made any difference in the result that the contract was ended. The fact that Lewisohn, also a promoter, had about a half interest in the contract does not affect the result unless his death and the fact that his executors reside in New York and that no legal representatives of his estate have been appointed or can be appointed in Massachusetts make a difference.

We are of opinion that these facts do not make a difference in the right of the plaintiff to maintain this bill.

On the contract thus coming to an end by the offer to restore the property which had remained unchanged, the defendant and Lewisohn were bound as matter of contract to return the consideration received by them under this contract. But in our opinion that is not the only remedy open to the plaintiff. The thirty thousand shares were obtained from the plaintiff by the defendant and Lewisohn in violation of the duty owed to it by them by reason of the fiduciary relation in which they stood to the plaintiff. The fact that on the rescission of the contract the plaintiff corporation could have sued to recover back from the

parties to the contract the consideration received by them under it does not preclude the plaintiff from charging the defendant directly with the violation of this fiduciary duty and compelling him to make restitution of what was so acquired by them.   The plaintiff can waive its remedy founded on the implied contract to return the consideration on the contract's being rescinded, and sue for the tortious violation of the duty owed by them to it because they stood to it in a fiduciary relation.   In a suit founded on such an equitable tort Lewisohn's executors are not necessary parties.   Such a bill may be brought against either.

Although the allegation made in the bill as to the real estate here in question remaining undeveloped and unchanged makes a decision on the point unnecessary, it is proper to point out that it has been laid down in this Commonwealth that in some cases a party to a contract who has a right to rescind is entitled to some remedy where the article sold has been consumed or altered before he has become aware of the facts which give him that right. *Parker* v. *Nickerson*, 137 Mass. 487.   As to what the law is in England on this point, see *Ladywell Mining Co.* v. *Brookes*, 35 Ch. D. 400; *In re Cape Breton Co.* 29 Ch. D. 795; *S. C.* on appeal, *sub nom. Bentinck* v. *Fenn*, 12 App. Cas. 652.   See also *In re Ambrose Lake Tin & Copper Mining Co.* 14 Ch. D. 390, 394.

It is hard to see why the defendant is not liable *in solido* for the whole thirty thousand shares, including those received by Lewisohn.   See *Hayward* v. *Leeson*, 176 Mass. 310, 324, and cases there cited, to which should be added *Gluckstein* v. *Barnes*, [1900] A. C. 240; *Trull* v. *Trull*, 13 Allen, 407.   But it is not necessary to express a final opinion on this point.

If the defendant does in fact restore the whole consideration, he will be subrogated to the real estate here in question, on the same principle on which a trustee making restitution of money improperly invested is subrogated to the improper investment.

A few technical objections remain to be disposed of, namely:

1. That the plaintiff has a complete and adequate remedy at law.   There is a remedy in equity to compel restitution of money taken in violation of the duty owed by a fiduciary.   *Hayward* v. *Leeson*, 176 Mass. 310, is an example.   See also *Warren* v. *Para Rubber Shoe Co.* 166 Mass. 97, 104.   This court now has full equity jurisdiction.   *Niles* v. *Graham*, 181 Mass. 41.

2. The defendant contends that the allegations as to the purchase of the property of the Baltimore company either are surplusage and are to be disregarded, or they make the bill multifarious. As no relief in respect to those allegations is sought here, the bill is not made multifarious by them. So far as necessary to tell the story of the sale here complained of, it was proper to describe the sale of the Baltimore company's property, and those allegations, to that extent, are not surplusage.

3. We see nothing inconsistent in the prayer for a rescission of the contract and in the prayer for damages by which (although inaptly put) we suppose the plaintiff intended what we have held it is entitled to.

The entry must be that

> *The so called demurrer as to part of the bill shall stand as an assignment of a cause of a demurrer; demurrer overruled.*