## PARKER v. NEW ENGLAND OIL CORPORATION.

### Petition of WILTSEE.

(District Court, D. Massachusetts. July 18, 1924.)

### No. 1747.

1. **Corporations** ⬤〰574—**Committee arranging reorganization held subject to limitations on trustees and not entitled to personal profits.**

In "conservation receivership" proceedings, a so-called "noteholders' committee," which intervened and obtained court's approval of plan for reorganization, and which became in effect promoters of plan to be carried into effect only by co-operation of court's receivers, *held*, like promoters, to occupy fiduciary relation subject to limitations placed on trustees, and not entitled to deal with trust estate to their personal profits.

**2. Corporations ⊚═574—Noteholders' committee in charge of reorganization under receivership proceedings required to give full and complete information concerning plan to all parties in interest.**

Where "noteholders' committee" intervened in "conservation receivership" proceedings, obtained court's approval of reorganization plan, undertook to promote and manage plan, and thereby assumed fiduciary relation analogous to that of promoters or trustees, *held* a creditor or stockholder, entitled to obtain through court full and complete information with respect to details of such plan, and that noteholders' committee should furnish it.

Receivership proceeding by Henry S. Parker against the New England Oil Corporation. On petition of Ernest Wiltsee, a creditor and stockholder, for full and complete information with respect to details of proposed reorganization. Petition granted.

Sherman L. Whipple and Frederick Foster, both of Boston, Mass., for Wiltsee.

Robert G. Dodge, of Boston, Mass., for Noteholders' Committee.

ANDERSON, Circuit Judge. This petition involves the right of a party in interest under a receivership reorganization to obtain through the court full and complete information with respect to the essential details of that reorganization. The situation is unusual, and presents questions of practice and procedure of some general interest in receivership reorganizations. It cannot be understood without first sketching the general situation.

On July 14, 1922, there was filed in this court a so-called creditors' bill seeking what has come to be called a "conservation receivership" of the respondent corporation. The respondent was alleged to owe over $11,000,000, and to have as its chief assets 75,000 shares, the entire capital stock, of the New England Oil Refining Company (hereinafter called the Refining Company), and also (subject to pledge) all of the capital stock of the New England Oil Corporation, Limited (hereinafter called the Canadian Company). The other assets were relatively small. The Refining Company is the owner of a large refining plant at Fall River, alleged to have made, in 1921, profits approximating $2,500,000. Its balance sheet shows $19,000,000 assets and liabilities. It was claimed to be a profitable enterprise; but in need of working capital, and rather badly extended. The Canadian Company had as its chief assets leases and concessions for oil lands in Venezuela.

The respondent corporation seems to have functioned chiefly as a holding company and as a borrower of money. One reason for the application for the receivership was a suit against the respondent corporation under which a judgment was entered for over $1,100,000—threatening, as was alleged, unwarranted sacrifice of the respondent's assets and irreparable damage to its other creditors.

A decree was entered on July 20, 1922, appointing receivers and enjoining interference with their possession and control of the respondent's assets, by attachment, levy, or in any other manner.

The situation was obviously one calling for a radical reorganization. And it was clear that a reorganization must be mainly based upon the prospective earnings of the Refining Company, plus such hopes as might rest upon the development of the oil properties in Venezuela. The Refining Company was the real going concern.

On January 8, 1923, on application of the receivers, a decree was entered for proof of claims on or before January 24, 1923. On February 26, 1923, the present petitioner, Ernest Wiltsee, filed a petition asking leave to intervene and to file his claim as a creditor. This petition to intervene was allowed, and, after a full trial, his claim was allowed in the sum of $176,000. From the decree allowing this claim an appeal was taken by the noteholders' committee, hereinafter referred to. In his petition of May 8, 1924, Wiltsee alleges that he is also a stockholder in the Refining Company. Whatever the nature and extent of his rights, as they may ultimately be determined, he must, for present purposes, be regarded as at least a substantial creditor, whose claim has been duly proved and allowed, of the respondent company. Creditors of the respondent corporation are, under the plan of reorganization, entitled to become stockholders of the Refining Company. They may have other rights. Compare Phipps v. Chicago, etc., R. R. (C. C. A.) 284 F. 945, 28 A. L. R. 1184.

On January 9, 1923, Francis R. Hart, Alfred L. Aiken, Allan Forbes, Frank Finsthwait, Thomas H. West, Jr., and Daniel G. Wing, describing themselves as "noteholders' committee under an agreement dated 15th November, 1922," were allowed to intervene, and were made parties to the suit. On January 22, 1923, this noteholders' committee filed a petition for approval of a plan of readjustment and reorganization. Attached to this petition was a printed "Preliminary Plan of Readjustment dat-

ed January 1, 1923," and also copies of various contracts which it was proposed to have executed by the parties in interest. After due order of notice, a decree was entered as of February 12, 1923, authorizing the receivers to participate in this plan of reorganization. The printed plan is hereto annexed and made a part hereof by reference.[1] It sets forth that the respondent corporation had provable debts of over $11,500,000, besides large contingent additional claims. Nearly half of the direct debt was due the Refining Company, of which, as above noted, the respondent company was the sole stockholder. The plan of reorganization contemplated the cancellation of this debt, and that the other creditors should receive preferred stock of the Refining Company which at par would equal the face of their debts, with a bonus of a like number of shares of common stock of no par value. New working capital was also necessary for the Refining Company. In order to carry out these main purposes, the capitalization of the Refining Company was to be so changed as to authorize $10,000,000 of 7 per cent. preferred stock, of which approximately three-fourths would go to the creditors of the respondent; the balance to remain in the treasury for future corporate purposes; also 1,500,000 shares of common stock of no par value; and mortgage bonds for $5,000,000, to be sold at 85 (with stock warrants and a bonus of common stock), thus furnishing $4,250,000 of new money for the Refining Company.

Other minor details are for present purposes immaterial. The pending petition relates mainly to the disposition of the 1,500,000 shares of common stock, but the settlement of the Tankers' Syndicate claim of some $18,000,000 is also in question. The printed plan sets forth:

"Of this amount 500,000 shares will be reserved for issue against the stock warrants above mentioned; 560,000 shares will be sold with the initial issue of the general mortgage bonds; 250,000 shares will be reserved for the corporate purposes of the company, including for issue to officers and employees of the Refining Company upon such basis as shall be approved by the noteholders' committee, and the balance may be issued so far as required to make the provisions hereinafter specified for existing debt and stock of the Oil Corporation; and the authorized amount of common stock

may if necessary be increased for the last-mentioned purpose."

The stock warrants, to meet which the 500,000 shares were reserved, gave rights to the holders of the general mortgage bonds, good at any time up to January 1, 1933, to buy 100 shares of this common stock at $10 per share.

It is obvious that the allotment of 560,000 shares of common stock, to be sold with the initial issue of $5,000,000 of mortgage bonds, amounts to 112 shares for each $1,000, bonds; and that this block of 560,000 shares is thus earmarked as destined by the plan for this specific purpose. 250,000 shares were made applicable to the corporate purposes of the Refining Company on such basis as should be approved by the noteholders' committee; the balance of 190,000 shares might be issued, so far as required, to meet the provisions set forth in the plan for existing debt and stock of the respondent corporation. The destination and use of the entire common stock issue of 1,500,000 shares were thus pretty closely and definitely provided for.

The plan also sets forth that:

"The noteholders' committee will endeavor to arrange for the sale of $5,000,000 principal amount of the general mortgage bonds, together with 560,000 shares of the common stock, for the sum of $4,250,000, together with accrued interest on the general mortgage bonds. Negotiations for this sale are now being conducted with Messrs. Malcolm G. Chace, Francis R. Hart, and Daniel G. Wing as syndicate managers."

Two of the syndicate managers, it will be observed, are also members of the noteholders' committee. There is also provision for a five-year voting trust, with five named trustees, made up of the same persons who are syndicate managers, with the addition of Bradley W. Palmer and Alexander Smith. The shares under this voting trust became, in substance, and at the hearing were referred to as, the equivalent of the shares of common stock of the Refining Company.

The plan also provides that "the manner in which the plan is to be carried into effect and the form of all procedure, documents and instruments are left to the determination of the noteholders' committee."

Turning again to the decree of February 12, 1923, approving this plan: The receivers were directed in general terms "to participate in said plan and to do any and all things which they may deem necessary or advisable in order to carry out and consum-

---

[1] See note at end of case.

mate the same." There follow several paragraphs of specific directions to the receivers, not necessary now to detail, ending with instructions to the receivers to make report of their doings thereunder, and "to apply for approval of this court of such arrangements as they may desire to make for the payment of the contingent claims against the defendant corporation, and for the payment of their expenses and remuneration." Nowhere in the decree is there any reference to the "preliminary drafts, subject to amendment, of the various contracts which it is proposed to have executed by the parties in interest," referred to in the noteholders' committee's petition for approval of the plan. Otherwise stated, the plan which was approved by the court was the printed plan hereto annexed. There is nothing to indicate, either in the decree or in the subsequent reports by the receivers, that the contracts, as distinguished from the printed plan, were ever brought to the attention of the court and given specific approval.

The printed plan controls, so far as now appears.

The receivers filed on February 17, 1923, the day when the decree of approval was actually entered, a report in which they suggested that the plan would be greatly improved by certain changes in the method provided for raising the new working capital for the Refining Company. They also reported that they had brought their views to the attention of the parties in interest, and had been informed that their suggested changes could not be adopted; and that they were therefore constrained to recommend that the plan be approved by the court as the best that could be presented under the conditions; the only alternative being such a liquidation as would leave practically nothing, even prospectively, for creditors.

The receivers made no comment or suggestion as to the disposition of the common stock, or the settlement of the Tankers' Syndicate claim of some $18,000,000, as a part of the plan of reorganization.

The general situation disclosed by the foregoing statement is: After the court had, on application by some of the parties in interest, enjoined creditors from pursuing their legal rights, and had taken possession of what may conveniently be called "a receivership estate," the noteholders' committee, made parties on their own application, sought and obtained the approval of the court for a plan of reorganization under which they became, in effect, promoters and managers of a plan of reorganization, approved by the court, to be carried into effect only by and through the co-operation and assistance of the court's receivers. On these facts the noteholders' committee plainly became fiduciaries for all the parties in interest in the receivership proceedings. The plan approved by the court contemplated that, while the noteholders' committee had pretty large discretionary powers, these powers should be exercised with the co-operation of the court's receivers, for the purposes, and only for the purposes, described and essentially limited by the printed plan approved by the court.

[1] It is not desirable, probably not practicable, now to undertake to define exactly the nature and extent of their powers and duties. It is enough, for present purposes, to characterize them under the general term of fiduciaries. Their position was, as already indicated, in many important respects, like that of the promoters of a corporation, who stand in a fiduciary relation to the corporation of which they are promoters. Old Dominion Copper Co. v. Bigelow, 188 Mass. 315, 320, 74 N. E. 653, 108 Am. St. Rep. 479; s. c., 203 Mass. 159, 89 N. E. 193, 40 L. R. A. (N. S.) 314; Erlanger v. New Sombrero Co., 3 App. Cas. 1218; Hayward v. Leeson, 176 Mass. 310, 57 N. E. 656, 49 L. R. A. 725. They had the general rights and powers, and were subject to the general obligations and limitations, of trustees. They could not, of course, trade with their trust estate to their own profit or otherwise use their position for personal profit. Hill v. Hall, 191 Mass. 253, 263, 264, 77 N. E. 831, and cases cited.

This general principle is well stated in Arnold v. Brown, 24 Pick. 89, 96, 97, 35 Am. Dec. 296, as follows:

"This wise and salutary rule, designed to protect the weak and incompetent from the encroachments and overreachings of the artful and the powerful, is founded upon two principles. The one is that the trustee has no right to derive any benefit or advantage from the trust fund; but all his skill and labor in the management of it must be directed to the advancement of the interest of his cestui que trust. The other is that the character of buyer and seller are incompatible, and can never be united in the same person, in whatever different capacities he may act. The agency of adverse interests is the surest guaranty of fidelity and equality in negotiations of this kind. The assent of two minds is essential

to the contract of sale, as well as to every other contract. Hence the action of one person can never change the ownership of property. There may be formal sales made by an executor, administrator, guardian, or trustee, to themselves, or to others for them, but the legal property will still remain unchanged and chargeable with the same trusts as before. Nor can this salutary rule be evaded by circuity of conveyances. As the trustee cannot sell directly to himself, so he cannot do the same thing indirectly, by selling to another person for his benefit. As he is bound to act in everything pertaining to the trust, for the advantage of the cestui que trust, so the latter always has the option to consider the sale valid or invalid as he shall deem most for his interest. When he is capable of acting, his assent will give vitality to a contract which before only had a potential existence."

[2] It is also important to consider what affirmative duty these fiduciaries—becoming such under what is, in substance and legal effect, an appointment and approval by the court—owe the parties in interest. Wiltsee's petition prays that the receiver (the resignation of one of the receivers because of his impending absence in Europe was accepted by the court) or the Refining Company or the noteholders' committee be directed to file a report containing full and complete information with respect to various points detailed in the petition. The only fairly debatable question is as to the proper method of recognizing Wiltsee's prima facie right to the information sought. On careful consideration, the sound course seems to be that when, as in this case, a reorganization is being carried out, as it were, under the ægis of a court of equity, the fiduciaries should be required by the court to make report to the court of their doings with the trust estate. In controlling aspects they are, in that regard, like ordinary probate trustees. The beneficiaries are entitled to get from the court records adequate information as to what their trustees have done with their property. It is elementary that trustees and receivers must make an affirmative showing of all their material acts concerning their trust estate. A fortiori, trustees having the large business and discretionary powers vested in this noteholders' committee should be required to spread seasonably upon the records of the court an account of their doings with their trust. Parties in interest in this case, mostly, if not entirely, creditors, should not be required to go to the expense of employing counsel and seeking information in pais or by independent court proceedings. They are entitled to know from the court which is, in vital aspects, administering their property what that administration has done with their property. The promoters of the approved reorganization are, under the facts here disclosed, a vitally important part of that administration.

The situation is to be carefully distinguished from interference by the court with the management of a corporation, which may, through and after the completion of a receivership reorganization, have come into possession and control of the receivership estate. Of course no court would think of interfering with the discretion of a board of directors or committee which might have happened to purchase, as a complete act, the property or estate once held in receivership. But the management of the Refining Company as a reorganized concern is a thing quite distinct from proceedings of the noteholders' committee dealing with rights of the parties that grow out of the noteholders' committee's relations to the court, in the reorganization conducted by the noteholders' committee under the approval of the court. The fact that such rights involve also rights in the reorganized Refining Company is immaterial.

It follows that the petitioner is entitled to a report, and that the report should be made, not by the Refining Company, nor by the receiver, but by the noteholders' committee, who stand, as already stated, in a position analogous to that of trustees of an estate.

A decree accordingly may be presented.

This is stated to be an early draft, and may in some details differ from the plan as approved.

### Note.

Preliminary Plan of Readjustment, January 1, 1923.

Present Debt of New England Oil Corporation (as of August 31, 1922)

Five-year 8 per cent. convertible gold notes:

| | | |
|---|---:|---:|
| Total outstanding | $5,762,000 | |
| Held by New England Oil Refining Company | 322,000 | |
| Balance | | $ 5,440,000 |

To New England Oil Refining Company:

| | | |
|---|---:|---:|
| Five-year 8 per cent. convertible gold notes | $ 322,000 | |
| Demand note secured or partially secured[1] | 1,250,328 | |
| Unsecured account | 3,225,372 | |
| Total | | 4,797,700 |

[1] The security for this demand note consists of all the stock and a $344,377.34 note of New England Oil Corporation Limited.

Note payable to France & Canada Oil Transport Company:

| | | |
|---|---|---|
| Face amount .................... | $ 200,000 | |
| Credit, say ..................... | 15,000 | 185,000 |

| | | |
|---|---|---|
| Judgment in favor of Island Oil Marketing Corporation (subject to adjudication) | 1,161,000 | |
| Miscellaneous direct liabilities (other than accrued interest and exclusive of approximately $5000 of items incurred by receivers)........................ | 9,412 | |
| Total ................................. | $11,593,112 | |

In addition to the foregoing the New England Oil Corporation (which is hereinafter called the Oil Corporation) is indebted for large amounts as guarantor of obligations of, or as joint obligor with, the New England Oil Refining Company (which is hereinafter called the Refining Company), and is also liable as guarantor of notes for $517,000 of New England Oil Corporation, Limited, a Canadian corporation (hereinafter called the Canadian Company). The Oil Corporation is also subject to a claim by the Sun Oil Company on account of alleged breach of contract.

### Present Outstanding Stock of the Oil Corporation.

Preferred stock, par value $100 a share, 19,-497 shares.

Common stock, no par value, 540,000 shares.

### Assets of the Oil Corporation.

In addition to the stock of the Refining Company, the only important asset of the Oil Corporation consists of all the stock and certain indebtedness of the Canadian Company as follows:

| | |
|---|---|
| Stock of Canadian Company...... | $ 10,000 |
| Increase arising through appraisal ......................... | 1,525,844 |
| Total stock ................... | $1,535,844 |
| Indebtedness for advances........ | 557,361 |
| Total stock and advances, Canadian Company ................................. | $2,093,205 |

Of this item, all the stock and $344,377.34 of the indebtedness is pledged to the Refining Company. $168,615 of the indebtedness is pledged to secure the $517,000 notes above mentioned. $44,369 of the indebtedness is unpledged.

### Proposed Capitalization of Refining Company.

First mortgage bonds—closed issue—now outstanding, $4,715,000.

General mortgage 8 per cent. sinking fund gold bonds, to be presently issued, $5,000,000.

These bonds (hereinafter called the initial issue of general mortgage bonds) will be dated January 1, 1923, payable January 1, 1943, subject to redemption on any interest day on 90 days' notice at 105 and accrued interest. The interest will be payable semi-annually without deduction for federal taxes up to two per cent.; the Pennsylvania four-mill tax will be refunded. Principal and interest will be payable in gold at the offices of Old Colony Trust Company, Boston, and Continental & Commercial National Bank, Chicago.

Each $1,000 principal amount of the initial issue of general mortgage bonds will be accompanied by stock warrants evidencing the right of the holder at his option, at any time up to January 1, 1933, to buy 100 shares of the common stock of the refining company at $10 per share.

The initial issue of general mortgage bonds will be part of an authorized total of $20,000,-000 of general mortgage bonds to be issued under an indenture of mortgage to Old Colony Trust Company as trustee (hereinafter called the general mortgage), covering all real estate now or hereafter owned by the Refining Company within the state of Massachusetts, subject to the first mortgage. The company will agree from time to time to subject to the lien of the general mortgage, as additional security for the general mortgage bonds, its present and future property to such extent as may be permitted by law and by the provisions of the first mortgage.

The stock of the Canadian Company, and all claims against the Canadian Company presently held by the Oil Corporation (except in so far as such claims shall be discharged), the other assets of the Oil Corporation, except in so far as such other assets may be disposed of with the approval of the noteholders' committee, and a site of approximately 497 acres on the Taunton river about 3½ miles above the present plant of the Refining Company will be subjected to the lien of the general mortgage as a first lien; and such stock, other assets, and site will thereafter, and subject to such lien, be transferred to the Refining Company.

The general mortgage will provide that 20 per cent. of the net earnings of the Refining Company available for dividends in 1923 and in each subsequent calendar year will not later than May 1st of the next following year be applied to the purchase or redemption of bonds of this issue. In ascertaining such net earnings, taxes, interest, and payments on account of principal of the first mortgage and of the purchase price of the seven tankers of the Swiftsure fleet, but not depreciation, will first be deducted from the gross earnings. The Refining Company will also covenant in the general mortgage at no time to pay any dividends which would leave its net quick assets at less than $5,000,000 or to make any plant investment not approved by such banking firm or other person as the noteholders' committee shall cause to be specified in the mortgage which would leave its net quick assets at less than $3,000,000. The general mortgage will provide that these minimum standards of $5,-000,000 and $3,000,000, respectively, are to be increased by the face amount of any bonds issued for additional working capital as below provided. The general mortgage will also permit the release of the stock of the Canadian Company for $2,500,000 cash to be applied to the purchase or redemption of these bonds, or on any other terms which shall be approved by such banking firm or other person as the noteholders' committee shall cause to be specified in the mortgage.

Of the general mortgage bonds not presently issued $4,715,000 are to be available for issue par for par to refund the first mortgage bonds, and the balance, or $10,285,000, are to be available for issue either (a) up to 50 per cent. of additional fixed assets subjected to the lien of the general mortgage as a first lien, or as a lien subject only to the lien of the present first

mortgage bonds, but only when the earnings of the Refining Company for the preceding year shall have been not less than three times all its interest charges, or (b) up to not more than $2,000,000 for additional working capital if and when approved by such banking firm or other person as the noteholders' committee shall cause to be specified in the mortgage. Interest on the reserved general mortgage bonds shall not exceed 8 per centum per annum.

Seven per cent. preferred stock, to be presently authorized, $10,000,000.

This stock to be in shares of the par value of $100 each, to be entitled in priority to the common stock to dividends at the rate of 7 per centum per annum cumulative from January 1, 1926, and to payment in case of liquidation or dissolution at $100 a share and accrued cumulative dividends, to be nonvoting, and to be subject to redemption on 30 days' notice at any time at $102½ a share and accumulated dividends.

The company in each calendar year shall set aside as a sinking fund to be applied to the purchase or redemption of the preferred stock a sum equal to 10 per cent. of the aggregate amount of the dividends paid upon the common stock during the preceding year.

The preferred stock may be issued so far as required to make the provision hereinafter specified for existing debt and stock of the Oil Corporation; and the authorized amount of preferred stock may, if necessary, be increased for this purpose.

Common stock, to be presently authorized, 1,500,000 shares.

Of this amount 500,000 shares will be reserved for issue against the stock warrants above mentioned; 560,000 shares will be sold with the initial issue of the general mortgage bonds; 250,000 shares will be reserved for the corporate purposes of the company including for issue to officers and employees of the Refining Company upon such basis as shall be approved by the noteholders' committee, and the balance may be issued so far as required to make the provisions hereinafter specified for existing debt and stock of the Oil Corporation; and the authorized amount of common stock may, if necessary, be increased for the last-mentioned purpose.

### Provision for Existing Debt and Stock of the Oil Corporation.

Holders of convertible gold notes (other than the Refining Company):

To receive for each $1,000 principal amount of notes 10 shares of preferred stock and 10 shares of common stock of the Refining Company.

Refining Company:

In consideration of the other advantages to be derived by the Refining Company under the plan no provision is made for the debt of the Oil Corporation held by the Refining Company and the Refining Company will dispose of such debt as the noteholders' committee may direct to facilitate the consummation of the plan.

Holder of note payable to France & Canada Oil Transport Company:

To receive 1,850 shares of preferred stock and 1,850 shares of common stock of the Refining Company.

Judgment in favor of Island Oil Marketing Corporation:

11,610 shares of preferred stock and 11,610 shares of common stock of the Refining Company to be placed in escrow with the transfer agent of the Refining Company, and when by final judgment, compromise or otherwise the litigation in which this judgment was recovered is settled and the amount, if any, due the Island Oil Marketing Corporation is finally determined, the shares so placed in escrow to be delivered to the Island Oil Marketing Corporation, or to whoever shall be entitled to receive the same in the right of the Island Oil Marketing Corporation, at the rate of one share of preferred stock and one share of common stock for each $100 of such amount. Any stock not so delivered to revert to the Refining Company.

Other direct creditors of the Oil Corporation:

To receive one share of preferred stock and one share of common stock of the Refining Company for every $100 principal amount of claim.

Contingent creditors of the Oil Corporation: In respect of each $100 principal amount of claims to receive as security upon terms approved by the noteholders' committee one share of preferred stock and one share of common stock of the Refining Company.

Preferred stockholders:

To receive one share of common stock of the Refining Company for each share of preferred stock of the Oil Corporation.

To have the further right in respect of each share of preferred stock of the Oil Corporation to purchase one share of the preferred stock and one share of the common stock of the Refining Company for the price of $80.[2]

Common stockholders:

To receive one share of the common stock of the Refining Company for each 10 shares of common stock of the Oil Corporation.

To have the further right in respect of each 10 shares of common stock of the Oil Corporation to purchase one share of the preferred stock and one share of the common stock of the Refining Company for the price of $80.[2]

### Sale of General Mortgage Bonds and Common Stock.

The noteholders' committee will endeavor to arrange for the sale of $5,000,000 principal amount of the general mortgage bonds, together with 560,000 shares of the common stock, for the sum of $4,250,000, together with accrued interest on the general mortgage bonds. Negotiations for this sale are now being con-

[2] If the rights of purchase aforesaid shall be exercised to such an exent that the Refining Company shall be called upon to furnish or deliver more than $7,000,000 par value of preferred stock, including all amounts presently to be issued under the said plan, or more than 701,350 shares of common stock presently to be issued under the said plan, the noteholders' committee either may require the Refining Company to issue an additional amount of preferred stock and to increase the authorized amount of common stock, or may itself furnish all or any part of the excess amounts of preferred and common stock necessary to meet the subscriptions to purchase at and for the respective prices above fixed.

ducted with Messrs. Malcolm G. Chace, Francis R. Hart, and Daniel G. Wing as syndicate managers under an agreement dated 11th of December, 1922, who are attempting for the purpose of making such purchase to complete the syndicate provided for in the said agreement.

## Management.

In order to provide a consistent policy of management for a term of years, the noteholders' committee and the proposed purchasers of the bonds mentioned above have made it a condition to the acceptance of the plan and of the purchase of the proposed bonds that all shares of common stock of the Refining Company shall be issued under and subject to the provisions of a share trust agreement. The said share trust agreement will provide that all of the common shares of the Refining Company shall be held by certain trustees for five years, that is, until December 31, 1927, and for a further period of five years if the said trustees shall so decide. Under the terms of the share trust agreement, the trustees are to have control over the important policies of the Refining · Company. The original trustees are to be Messrs. Malcolm G. Chace, Francis R. Hart, Bradley W. Palmer, Alexander Smith, and Daniel G. Wing, and vacancies may be filled only by the unanimous consent of all the trustees, including the resigning trustee in case of a vacancy caused by resignation.

Wherever in this plan mention is made of common shares or the issue or delivery thereof, it is to be understood that the terms apply to share trust certificates issued under the said share trust agreement, and that no persons except the trustees shall be entitled to receive any such common shares until the expiration of the share trust agreement and according to its terms.

## Consummation of Plan.

The manner in which the plan is to be carried into effect and the form of all procedure, documents, and instruments are left to the determination of the noteholders' committee. All holders of claims against the Oil Corporation who receive shares of the Refining Company in accordance with this plan shall transfer and deliver their claims to a nominee or trustee appointed by the noteholders' committee, and all shareholders of the Oil Corporation who receive shares of the Refining Company under the plan shall transfer and deliver their shares in the Oil Corporation to a nominee or trustee appointed by the Refining Company, All notes and other evidences of claims so transferred shall be stamped by the receivers to show the number of shares of the Refining Company distributed in respect thereof. The said claims and shares shall be held by the said nominees or trustees for the purpose of protecting the interests of all persons participating in this plan and of enabling the same to be carried out upon and subject to such terms as shall be determined by the noteholders' committee and Refining Company respectively. When all claims against the Oil Corporation shall have been so transferred the same may be canceled.