HART et al. v. WILTSEE et al.

PARKER v. NEW ENGLAND OIL CORPORATION.

Circuit Court of Appeals, First Circuit.
May 17, 1927.

Rehearing Denied, with Modifications, July 11, 1927.

No. 2070.

1. **Judgment** ⬥18(2)—Creditor's petition, seeking information as to reorganization, held not adversary proceeding, nor to be made such by amendment, so as to be basis. of judgment.

Petition by creditor, seeking information relative to reorganization effected by noteholders' committee after receivership, making no charges and calling for no relief, nor for damages, is not an adversary proceeding, nor could it properly be turned into one by amendment on completion of investigation, and evidence taken thereunder made basis of decree or judgment for damages against objection of committee.

2. **Constitutional law** ⬥315—Allowing damages against members of debtor's committee nunc pro tunc as of date of original petition, seeking only information relative to reorganization, held contrary to due process.

Where creditor's petition, seeking information relative to reorganization effected by noteholders' committee after receivership, was not an adversary proceeding, nor such as could be made one by amendment, allowance of subsequent petition for damages against committee nunc pro tunc as of date of original petition *held* erroneous, as depriving members of committee of due process of law, to which they were entitled, since committee, coming into court on original petition, was entitled to look thereto for charges that they would be called on to answer and defend against.

3. **Corporations** ⬥574—Receiver should bring proceeding for damages occasioned receivership estate through alleged fraud of noteholders' committee.

Proceeding to recover damages occasioned receivership estate through alleged fraud of noteholders' committee should be brought by receiver, in whom right existed, and not by creditor of corporation, to whom right did not belong, and to whom it was never assigned.

**4. Corporations ⊱574—Proceeding to recover damages occasioned receivership estate through alleged fraud of noteholders' committee should be plenary one at law or in equity.**

Proceeding to recover damages occasioned receivership estate through alleged fraud of noteholders' committee, in order to confer jurisdiction on court, should have been a plenary one at law or in equity, since it was not to recover property belonging to receivership estate in possession of committee, but was for a tort to recover damages occasioned estate by alleged fraud, in which case, unless it is made to appear that remedy at law is inadequate, proceeding would be action at law.

**5. Courts ⊱264(3)—Federal District Court had jurisdiction of proceeding to recover damages occasioned receivership estate through alleged fraud of noteholders' committee.**

Federal District Court had jurisdiction of proceeding to recover damages occasioned receivership estate through alleged fraud of noteholders' committee, whether it be brought on equity or law side of court, as it would be ancillary to original receivership bill.

Appeal from the District Court of the United States for the District of Massachusetts; George W. Anderson, Judge.

Receivership proceedings by Henry S. Parker against the New England Oil Corporation, wherein Ernest Wiltsee intervened, seeking information as to the reorganization effected by Francis R. Hart and others, a committee representing the noteholders. From decrees (4 F.[2d] 392; 8 F.[2d] 392; 13 F.[2d] 158) directing the committee to give the desired information, and finding that decree secured by the committee, approving reorganization, was fraudulently secured, and finding that receivership had been damaged to a certain extent, and holding members of committee jointly liable therefor, Francis R. Hart and others, as members of such committee, appeal. Decrees vacated, and case remanded, with directions.

See, also, 15 F.(2d) 236; 16 F.(2d) 838.

Charles F. Choate, Jr., and Nathan Matthews, both of Boston, Mass., for appellants Hart and others.

Powers & Hall, James N. Clark, and Robert H. Montgomery, all of Boston, Mass. (Frederick R. Ryan, of New York City, of counsel), for appellant Finsthwait.

Tillinghast & Collins, William R. Tillinghast, and James C. Collins, all of Providence, R. I., for appellants West and another.

Sherman L. Whipple, Claude B. Cross, and Frederick Foster, all of Boston, Mass., for appellees Wiltsee and others.

Arthur D. Hill, of Boston, Mass., Francis L. Kohlman, of New York City, Faneuil

Adams, of Boston, Mass., and Saul J. Lance, of New York City, for appellees Stevens and others.

Romney Spring, of Boston, Mass., for appellees Kimball and others.

Lincoln Bryant, of Boston, Mass., for appellee Russell.

Before BINGHAM and JOHNSON, Circuit Judges, and MORRIS, District Judge.

BINGHAM, Circuit Judge. July 14, 1922, Henry S. Parker, a creditor of the New England Oil Corporation, brought a creditor's bill seeking the appointment of receivers for the oil corporation in the District Court of Massachusetts. July 20, 1922, Gaspar G. Bacon and Irvin McD. Garfield were appointed receivers. January 8, 1923, the New England Oil Refining Company and Francis R. Hart, Daniel G. Wing, Alfred L. Aiken, Allan Forbes, Frank Finsthwait, and Thomas F. West, Jr., a committee representing the holders of notes of the New England Oil Corporation, were made parties to the receivership proceeding. January 22, 1923, the committee presented a plan of reorganization,[1] which the court on February 17, 1923, approved. February 26, 1923, Ernest Wiltsee was allowed to intervene and file a late proof of claim, and on June 27, 1923, was adjudged a creditor of the Oil Corporation in the sum of $176,000, which judgment on January 5, 1925, was affirmed by this court. May 8, 1924, Wiltsee filed a petition (see margin[2]) asking information as to the

---

[1] For the terms of which see Parker v. New England Oil Corp. (D. C.) 4 F.(2d) 392, 396, note.

[2] Petition of Ernest Wiltsee, Claimant, filed May 8, 1924.

"Now comes Ernest Wiltsee, an intervening party in said cause, and a stockholder in the New England Oil Refining Company, also an intervening party in said cause, and says that by virtue of a decree of this court entered the twenty-seventh day of June, 1923, a claim of the said Ernest Wiltsee against the respondent corporation was allowed in the sum of one hundred and seventy-six thousand dollars ($176,000);

"That an appeal from said decree of June 27, 1923, by the noteholders' committee, an intervening party in said cause, and said New England Oil Refining Company jointly, is now pending in the United States Court of Appeals for the First Circuit, which appeal cannot be heard and determined for a period of many months;

"That under and by virtue of a decree entered in these proceedings, on the 17th day of February, 1923, the receivers of the respondent corporation were authorized to participate in a plan of reorganization, sometimes called plan of readjustment, by which plan it is provided that direct creditors of the respondent

reorganization effected by the committee and the manner of carrying it into effect. August 13, 1924, a decree was entered directing the committee to give the desired information. August 27, 1924, the committee filed its report. March 13, 1925, Wiltsee filed a second petition asking for further information. April 4, 1925, he filed another petition, as an amendment to his petition of March 13, in which he set out that the object and purpose of the plan of reorganization and the intervention of the noteholders' committee were to acquire control of the New England Oil Refining Company, in the interest of the Petroleum Heat & Power Company and other companies in order to control or destroy the competition in interstate commerce in fuel oil, and particularly to control or destroy the competition of the Ballard Company therein, and prayed an investigation of the activities of the noteholders' committee, the syndicate, the syndicate's managers, and others who participated in the plans of reorganization, "to the end that it may be determined whether the order and decree of approval of said plans ought not to be revoked, or some other appropriate remedy be given to your petitioner and other creditors and stockholders of the defendant, New England Oil Corporation, and that in said inquiry witnesses having knowledge of the facts be summoned and orally examined." April 27, 1925, a decree was entered requiring the committee to make a further report, which it did on May 19, 1925.

Hearings were had at various times on the petition of May 8, 1924, and petition of March 13, 1925, as amended April 4, 1925, down to June 26, 1925, when the court declined to proceed further with the Sherman Act inquiry and ordered it and the evidence taken under it struck out. Thereafter hearings were had, at which testimony was taken, both oral and written, when on July 29, 1925, the taking of evidence was concluded. July 28, 1925, the day before the completion of the evidence, Wiltsee filed a petition in his own behalf asking damages against the noteholders' committee for failure of duty. July 31, 1925, he presented a petition (see margin [3]) in behalf of himself and all

corporation shall receive one share of preferred stock and one share of common stock of said New England Oil Refining Company for every one hundred dollars ($100) principal amount of claim;

"That the details of said plan and the manner of carrying the same into effect are of great present importance to your petitioner, as bearing on the value of the stock which your petitioner will be asked to receive in the event that the Circuit Court of Appeals shall find him to be a creditor in any amount.

"Wherefore your petitioner prays that the receiver of the respondent corporation, or said New England Oil Refining Company, or said noteholders' committee, be ordered and directed to file in this court on or before the 21st day of May, 1924, a report containing full and complete information with respect to the following matters:

"(1) The terms and agreements for the purchase and/or use by said New England Oil Refining Company or any of its subsidiaries of the seven tankers of the Swiftsure fleet referred to in said plan of readjustment, and what action has been taken pursuant to said terms and agreements;

"(2) What steps, if any, have been taken by the said noteholders' committee, or otherwise, for the release from the general mortgage provided for in said plan of readjustment of the stock of the Canadian Company, so called (the New England Oil Corporation, Limited);

"(3) What disposition, of any, has been made by the said noteholders' committee, or otherwise, of the 250,000 shares of the stock of said New England Oil Refining Company provided by said plan of readjustment to be reserved for the corporate purposes of said New England Oil Refining Company, including for issue to officers and employees of said company;

"(4) What disposition, if any, has been made by said Refining Company, or by said noteholders' committee or otherwise, of the debt of the respondent corporation held by said Refining Company;

"(5) What arrangements for the sale of $5,000,000 principal amount of the general mortgage bonds and 560,000 shares of the common stock of said Refining Company have been made by said noteholders' committee, or otherwise, as provided in said plan of readjustment, and what disposition, if any, has been made of said bonds and of said stock;

"(6) What important policies for the operation of said Refining Company have been laid down by the trustees under the trust agreement, as provided in said plan of readjustment, and what important policies are in contemplation of said trustees for the future operation of said Refining Company;

"(7) Any other action taken by said noteholders' committee or said Refining Company, pursuant to said plan of readjustment, which would in any way affect the interests of the holders of the preferred and common stock of said New England Oil Refining Company.

"By his attorneys,
"William Gates, Jr.
"Frederick Foster.
"Sherman L. Whipple.
"F."

[3] Petition of Ernest Wiltsee in behalf of himself and all other creditors of the respondent corporation who may join in the allegations and become liable for their proportionate share of the expenses of prosecution thereof, filed July 31, 1925, as of May 8, 1924:

"Your petitioner, Ernest Wiltsee, respectfully represents:

"(1) Your petitioner was at the time of the institution of receivership proceedings, and still is, a creditor of the defendant corporation. The amount which was and still is due him is $176,000 with interest; said amount having

other creditors of the Oil Corporation who might become parties thereto, containing substantially the same allegations as the petition of July 28th, and asking for damages

against the committee. August 4, 1925, the District Court allowed the last petition to be filed nunc pro tunc as .of May 8, 1924, the date of Wiltsee's original petition.

been adjudicated as due to him by decree of this honorable court entered June 27, 1923, and afterward confirmed by the Circuit Court of Appeals.

"(2) At the time of the filing of the bill in this cause there were other creditors of the respondent corporation. Of these creditors several hundred held notes of the corporation known as five-year 8 per cent. convertible gold notes; said notes outstanding amounting in the aggregate to $5,440,000.

"There was also outstanding a claim against the respondent in favor of the Island Oil Marketing Corporation for alleged breach of contract; said claim having been since determined to be about $900,000 in amount.

"Your petitioner is informed, and therefore alleges, that most, if not all, of the creditors of the respondent corporation, other than your petitioner, have heretofore transferred to the noteholders' committee, so called, their respective claims, receiving therefor shares, common and preferred, of the New England Oil Refining Company; but whether said transfers, under the circumstances appearing in this case, are valid and binding, or whether they are invalid or voidable, your petitioner is not informed.

"(3) Your petitioner brings this petition in behalf of himself and all other existing creditors of the respondent corporation who may desire and may be permitted by the court to become parties to this petition, join in its allegations, and pay their proportionate part of the expenses of the prosecution of the same.

"(4) When and before the proceedings in this cause were instituted, the respondent corporation was possessed of assets ample for the payment of all its debts. The bill so alleges, and the answer so admits.

"The principal assets of the respondent corporation when the bill was filed were the entire capital stock of the New England Oil Refining Company (hereinafter called the Refining Company) and of the New England Oil Corporation, Limited (hereinafter called the Canadian Company). The capital stock of the former consisted of 75,000 common shares, and of the latter 2,000 common shares.

"The net operating earnings of the Refining Company for the year 1921 had amounted to about $3,300,000.

"Its net operating earnings for 1922 were $3,200,000.

"And, based on the business of the company actually in hand, the prospective net operating earnings of the Refining Company for the year 1923 were estimated to be not less than $5,000,000.

"The business of the Refining Company had increased from something like 300,000 barrels in 1920 to over 6,000,000 barrels in 1922.

"(5) At the time of the filing of the bill, the enterprise owned and controlled by the respondent corporation, through its ownership in the stock of subsidiaries, was a sound and prosperous business enterprise. It had made very large profits, and it was believed by those who had knowledge of its affairs that

its profits in the future would be largely increased. Its rapidly increasing business needed the assistance of bankers and financial men in furnishing additional capital.

"(6) In or about November, 1922, after the official receivers had been in possession of the respondent corporation's affairs since their appointment in the previous July, Francis R. Hart, Daniel G. Wing, Alfred L. Aiken, and Allan Forbes constituted themselves as a noteholders' committee so called. They thereafter joined with themselves as members of such committee Frank Finsthwait and Thomas H. West, Jr.

"The committee so constituted, hereinafter called the noteholders' committee, and its members, thereafter, upon their petition duly filed and allowed, became and ever since have been parties in this cause and subject to the direction and decree of this honorable court.

"(7) In or about November, 1921, the Refining Company entered into negotiations with three corporations, M. G. Chace Company, of Providence, R. I., Peabody, Houghteling & Co., of Chicago, Ill., and the Old Colony Trust Company of Boston, in order to secure a loan. As a result of such negotiations, and as a condition of the loan being made, the Refining Company was compelled to enter into a contract with said corporations to purchase from them interests in a fleet of tankers, so called, at an unconscionable and extortionate price.

"For the purpose of carrying the agreement into effect, said three corporations organized a corporation known as the Tanker Syndicate, Inc., which became a nominal party to the contract.

"Said ill-advised, extortionate, and unconscionable contract between said Tanker Syndicate, Inc., as representing said M. G. Chace Company, Peabody, Houghteling & Co., and the Old Colony Trust Company, and the Refining Company, was outstanding in July, 1922, at the date of the appointment of the receivers in this cause.

"By said contract, and the threat of enforcement of its unconscionable terms and otherwise, said M. G. Chace Company, Peabody, Houghteling & Co., and the Old Colony Trust Company had become dominant in the management of the affairs of the Refining Company.

"M. G. Chace, the owner and controlling spirit of M. G. Chace Company, and Alexander Smith, the president and controlling spirit of Peabody, Houghteling & Co., had become and were at said date directors of the Refining Company and two of the five members of the executive committee.

"Francis R. Hart, a director of the Old Colony Trust Company, and vice chairman of the board, and Philip Stockton, president of the Old Colony Trust Company, though occupying no official position, were strongly influential, in combination with Smith and Chace, in management of the affairs of the Refining Company, and were present at many of the meetings of its executive committee.

"(8) Prior to the filing of the bill, both the respondent and the Refining Company were in

October 7–8, 1925, a decree was entered in which it was found that the committee obtained the decree of February 17, 1923, approving the plan of reorganization through

fraud and were guilty of fraud in carrying out the plan. It ordered (1) rescission or modification of the decree of February 17, 1923, approving the plan, so far as it affect-

need of money to finance their expanding business. Said Chace and said Smith, by virtue of their membership in the board of directors and executive committee, were thoroughly acquainted with the financial needs of both companies and of their endeavors to secure loans. Said Hart and said Stockton were also fully advised as to the Refining Company's financial situation and its endeavors to secure financial aid.

"During the summer of 1922, said Smith, Chace, and associates in the Tanker Syndicate were awaiting results of efforts being made by certain other officials of the Refining Company to finance its needs. They had full knowledge regarding such efforts, the aid promised, and the difficulties encountered.

"In or about October, 1922, said Smith, having for some months had the matter in contemplation, presented to the executive committee, and later to the directors of the Refining Company, a scheme or plan prepared by him.

"Said plan was at a later date made known, in part, at least, to the court, under circumstances and with the reservations and concealments hereinafter stated. The principal features of the plan were these:

"(a) It provided for the taking from the respondent corporation of its 75,000 shares of Refining Company stock, the cancellation of the same, and the new issue of 1,500,000 shares of common, and about $6,500,000, par value, of preferred (nonvoting) shares.

"(b) It provided for the taking from the respondent corporation of its 2,000 shares in the Canadian Company and transferring the interests represented thereby to the Refining Company.

"(c) It provided that the Refining Company should issue a second mortgage upon certain assets to secure $5,000,000 general mortgage 8 per cent. sinking fund gold bonds.

"(d) It provided that the entire issue of 1,500,000 shares should be held in a voting trust for a period of five years, so that the shareholders would have no power to control or even influence the administration of the affairs of the Refining Company.

"Said plan, in point of fact, was intended by said Smith, and had the effect, to give to the companies represented by said Smith and said Chace, to wit, Peabody, Houghteling & Co. and M. G. Chace Company, large and unreasonable profits, the taking of which was inconsistent with and a violation of their fiduciary duty to the Refining Company.

"It was intended by said Smith and his associates that the funds realized as a result of said plan should be applied largely to the benefit of the Tanker Syndicate and obligations to that syndicate claimed to be overdue on the unconscionable contract hereinbefore referred to.

"The purpose and effect of said plan was to give to said Tanker Syndicate a further predominating power and control of the Refining Company and to deprive your petitioner and other creditors of the respondent corporation of the value of the assets held by the said

corporation, which, as heretofore set forth, if properly handled, were quite sufficient to pay all its debts.

"(9) Neither said M. G. Chace Company, nor Peabody, Houghteling & Co., nor said Smith or Chace, or any of the officials of said companies, nor the Old Colony Trust Company, nor the Tanker Syndicate, or any of its officials, presented or participated in presenting said plan to the court, although said plan was contrived in the interest of said companies, and said companies would all largely profit by its being carried into effect.

"In order that said plan might be so presented to the court as to conceal the interest therein of the Tanker Syndicate and the aforementioned companies, and to disarm criticism, and to secure the indorsement of the plan by the court, it was arranged that the plan should be presented and sponsored by said Hart, Forbes, Aiken, Wing, Finsthwait, and West, who, for the purpose of thus presenting said plan, constituted and selected themselves as a so-called noteholders' committee.

"Said noteholders' committee, so called, in order to secure the authority of the court to carry out said Smith plan, assumed a fiduciary duty in relation to the court. They also assumed a fiduciary duty to the noteholders and creditors of the respondent corporation, asking and inviting said creditors to rely upon the advice and guidance of said committee in the adoption and carrying out of said plan.

"Said committee thereby became bound to make full and complete disclosure of all material facts, both to the court and to each and all the creditors of the respondent corporation, and to act throughout and in all respects with due fidelity both to the court and to said creditors, and to act in all respects unselfishly in the interest of said creditors and for the protection of their property rights.

"Said committee in said fiduciary relation had no right to act for their selfish interests, or in such a way as to enable their associates to make unjust or improper profits in the carrying out of said plan.

"(10) The noteholders' committee did not perform or discharge the duties which they had assumed with diligence and fidelity. They dealt with said assets without a proper regard for the interests of the respondent corporation, but in such manner that the assets, which, as hereinbefore set forth, were of sufficient value, if properly handled, to pay in full all the creditors of the respondent corporation, were dissipated and wasted.

"Wherefore your petitioner respectfully prays:

"(1) That it may be adjudicated and decreed that the noteholders' committee have failed in their fiduciary duty to your petitioner and other creditors of the respondent corporation, and that, by reason of such failure of duty, the entire assets of the respondent corporation, which were of sufficient value to pay all its debts, have been misused and lost;

"(2) That a decree be entered requiring said noteholders' committee to pay over to the re-

ed the rights of Wiltsee or any other creditors of the receivership estate who might thereafter join in the proceedings and be held entitled to rescind the settlement of their debt claims with the committee; and (2) that creditors, who in good faith and without notice of the invalidity of the reorganization proceedings assigned their claims to the committee or its nominee and accepted preferred and common stock of the Refining Company for their debt claims, by joining in these proceedings were entitled to elect to rescind said settlements, return their stock to the receiver for the committee, and be reinstated in their rights as unpaid creditors of said receivership estate and/or against said committee.

The committee undertook to appeal from the decree of October 7–8, 1925, but the District Court denied their right to do so. The committee then filed a petition in this court for a writ of mandamus requiring the District Court to allow their appeal. November 16, 1925, the petition for mandamus was denied. Thereafter on December 14, 1925, a decree was entered in the District Court amending the decree of October 7–8, but only in so far as the decree of October 7–8 fixed the time when the acts and things therein required to be done should be performed. This decree ordered the receiver to notify creditors of the opportunity to join in the proceedings and rescind their debt settlements, and directed that the case stand for hearing January 25, 1926, on "all petitions to intervene and objections thereto and any other appropriate pleadings, as well as on the general issue of the extent of the committee's liability.

spondent corporation a sum of money equal in value to the assets which have been misused, wasted, and dissipated, out of which the receiver of the respondent be ordered to pay to your petitioner the amount of the debt due him, with interest, together with his reasonable expenses in the litigation hereinabove referred to, with a reasonable allowance for the value of his own time and effort expended in connection therewith;

"(3) Or, in the alternative, in case no other creditors appear and join in this petition, and in order to avoid circuity of action, that said noteholders'' committee be ordered to pay to your petitioner directly a sum equal in the aggregate to the amount of the debt due him, with interest, his reasonable costs and expenses of litigation, including counsel fees and disbursements, together with a reasonable sum to be allowed the petitioner for his compensation for the time and effort which he himself has personally devoted to the proceedings hereinabove referred to.

"Ernest Wiltsee, by His Solicitors,
"Sherman L. Whipple,
"Frederick Foster,
"Claude B. Cross."

Numerous creditors in the early part of January, 1926, filed petitions to intervene and on January 18, 1926, the committee filed objections to the claims of the intervening creditors and to the attempted rescissions by the creditors permitted by the decree of October 7–8—December 14, 1925. January 23, 1926, the committee filed various motions to the effect that (1) Wiltsee's petition of July 28, 1925, should be dismissed on the ground that the claim therein set out belonged to the receivership estate and could only be enforced by the receiver in separate proceedings, and that that petition was superseded by the Wiltsee petition of July 31, 1925; (2) that the petition of July 31st be dismissed; and (3) that the petitions filed on behalf of all former creditors be dismissed. On that date (January 23) the committee also, without waiving their rights under their motions, filed answers to the petition of July 31, 1925, and to the creditors' intervening petitions.

On January 25, 1926, the committee also filed requests for rulings to the effect (1) that the deposit agreement of November 15, 1922, was a subsisting agreement and had not been rescinded; (2) that it could not be rescinded on Wiltsee's petition because he was not a party to the agreement, and could only be rescinded in a plenary proceeding instituted in a court of equity having jurisdiction of the parties and the subject-matter by one who had become a party to the agreement, and not in a summary proceeding in the receivership case; (3) that the District Court in the receivership proceeding had no jurisdiction, on any petitions or pleadings theretofore filed, to set aside the debt settlements; that if any party was entitled to bring action against the committee for maladministration such party was the receiver and then only in a plenary suit, for no creditor of the Oil Corporation had in his own right any claim against the committee; that the District Court was without jurisdiction to enter a decree against the committee for damages to the receivership estate, except in a plenary proceeding brought by the receiver in which the committee might plead and have a fair trial on the merits; that any decree entered by the court on the present pleadings would be a denial of due process of law and in violation of the Constitution; and generally objected to the right of creditors to rescind their debt settlements. February 17, 1926, additional rulings were requested to the effect that, upon the issue of concealment of information from the court, the judge who asserts that information was withheld from him is disqualified to pass upon the question.

March 15, 1926, further requests for rulings relating to damages were filed, and other requests asking that Wiltsee's petition of July 31, 1925, and all intervening petitions of creditors be dismissed on the ground that there was no evidence to support them, as none of the evidence taken prior to July 31, 1925, could be considered as before the court on these petitions, and for other reasons. March 22, 1926, further rulings were requested. All the requests for rulings were denied, subject to exception. May 15, 1926, a decree was entered to the effect that due to the maladministration and fraudulent action of the committee the receivership estate had been damaged in a sum not less than $6,000,000, and holding the members of the committee liable jointly and severally to pay the receiver the full amount of the claims of Wiltsee and all other intervening creditors, with interest compounded on the basis of semi-annual rests ($3,173,898.94), plus counsel fees and expenses awarded to creditors ($146,380.09), and the receivers' expenses and fees ($7,461.55), making a total of $3,327,740.48. It is from this decree of May 15, 1926, and the decrees of August 13, 1924, April 27, 1925, and October 7–8—December 14, 1925, that this appeal is taken.

The corporations comprising what has been termed in the record the Oil Enterprise were the New England Oil Corporation, the New England Oil Refining Company, and the New England Oil Company, Limited, called the Canadian Company. The New England Oil Corporation was organized in 1920 under the laws of Virginia. It was a holding company. Its assets consisted of all the capital stock of the Refining Company and an equity in all of the capital stock of the Canadian Company, which had been pledged to the Refining Company to secure a loan and had been again pledged by the Refining Company to secure one of its loans. The Refining Company was the operating company, a Massachusetts corporation, organized in 1919 for the purpose of refining and distributing crude oil and its products. It had a refining plant at Fall River, Massachusetts. The New England Oil Corporation, Limited, the Canadian Company, was organized in 1921 for the purpose of taking over and developing certain oil concessions in Venezuela, previously acquired by the Oil Corporation. These corporations were financed by borrowed money. None of their share capital had been paid in except about $4,610, paid to the Oil Corporation for 461,000 shares of its stock. The money raised by loans amounted to about $9,000,000, and

this, with the surplus income of the Refining Company, had been expended on the refining plant and in attempts to develop the Venezuela concessions. There was a mortgage securing $5,000,000 8 per cent. bonds on the plant of the Refining Company, and all three corporations were very largely indebted to banks and others. There were outstanding some $5,000,000 so-called gold notes of the Oil Corporation. In June, 1922, the Island Oil Marketing Corporation of Virginia obtained a judgment against the Oil Corporation in a sum exceeding $1,000,000, which was likely under the laws of that state to become a lien upon the assets of the Oil Corporation prior to its other obligations. The Oil Corporation was unable to furnish a supersedeas bond necessary to appeal from the judgment. It was therefore decided to apply for a receiver, who could appeal from the judgment without filing a supersedeas bond, and the receivership proceeding followed in July, 1922.

In the fall of 1922 the appellants were constituted a committee of the holders of the gold notes of the Oil Corporation for the purpose of devising a plan for the reorganization of the Oil Enterprise. Of this committee Hart was a director of the United Fruit Company, which owned $500,000 of the gold notes, and an officer in the Old Colony Trust Company, which had an interest in the Tanker Syndicate and a considerable interest in the debts of the Refining Company. Wing was president of the First National Bank, a large holder of gold notes, and otherwise financially interested in the enterprise. Aiken was president of the National Shawmut Bank, a large holder of gold notes. Forbes was the president of the State Street Trust Company, a holder of gold notes and otherwise financially interested in the enterprise; he was also a director in the Refining Company. Finsthwait represented institutions and individuals in Pennsylvania that were holders of gold notes. West, Jr., represented institutions and individuals in Rhode Island who were holders of gold notes. None of the appellants had any personal interest in the Oil Enterprise.

November 15, 1922, a deposit agreement was executed by the committee to which the holders of all, or substantially all, of the gold notes became parties by depositing the same with the committee under the terms of the agreement. Under this agreement the committee became the trustees or agents for the holders of the gold notes, invested with certain powers and duties of a fiduciary nature in their behalf. The agreement, how-

ever, provided that no member of the committee should be responsible for any act, omission, or error not resulting from his own willful misconduct, and that any member might be or become an officer, director, or stockholder, or pecuniarily interested, in any property or corporation with which the committee might have to deal. This is the agreement under which the noteholders made their debt settlements that were rescinded by the decree of October 7–8—December 14, 1925, and which the committee asserts was done without right; that no depositor (noteholder) had applied therefor, no charges had been formulated, and no trial had.

The committee never had possession of any of the assets of the Oil Corporation or of the receivership estate. The only property they had possession and control of were the gold notes of the creditors whom they represented under the authority contained in the deposit agreement; the notes having been deposited with them pursuant thereto.

Among the contracts and papers turned over to the receivers at the time they took possession of the property of the Oil Corporation under the decree of the court was a contract between the Refining Company and the Tankers' Syndicate, Inc., relating to the purchase of seven oil tankers by the Refining Company, and a loan to it of $1,300,000. The Tanker contract is the one as to which the District Court, in its opinions of October 3, 1925, and April 28, 1926, found that the committee, through fraud and deception, had damaged the receivership estate in a sum exceeding $5,000,000.

In the opinion of October 3d the District Court found that the Tanker contract called for payments in installments of the sum of $17,271,000; that at the time the contract was made the Tankers were not worth more than $3,000,000; and that the purpose of the receivership, participated in by the committee through the plan of reorganization, was to procure funds with which to meet the large overdue payments under the Tanker contract and leave the Refining Company without the necessary funds to carry on its business, instead of raising funds to enable it to carry on its business, as the plan of reorganization on its face purported to do; and that this purpose and resultant effect were concealed and withheld from the court in procuring the plan and the subsequent decrees of the court authorizing the receivers to carry the plan into effect.

In the opinion of April 28, 1926, the court further found that the reason or motive actuating Cochrane and the other directors of the Refining Company to enter into the contract with the Tanker Syndicate was shown by the following facts: That Cochrane, Harper & Co., of which Cochrane, a director of the Refining Company, was a member, back in 1920—when the Oil Corporation authorized an issue of $8,000,000 of its gold notes, of which about $5,000,000 was issued—owned all of the stock of the Oil Corporation and had undertaken to market $6,000,000 of its notes at 89 net to the corporation; that this firm was taking over these notes in installments and paying for them as the marketing went on; that in March, 1921, they desired to obtain a block of $616,000 of the notes without paying or obligating themselves to pay therefor at the agreed price of 89; that later, on March 18th, at a meeting of the directors of the Oil Corporation, at which Forbes, a member of the noteholders' committee and a director of the Oil Corporation, was present, it was voted to accept a list of securities from Cochrane, Harper & Co. in full payment for the $616,000 of gold notes; that Cochrane, Harper & Co. then agreed, in case the corporation did not realize out of a sale of the securities before January, 1922, a sum sufficient to meet the agreed price and interest thereon, to pay the difference; that the securities turned over at that time by Cochrane, Harper & Co. to the Oil Corporation were worthless; that as a result this firm in November, 1921, owed the Oil Corporation nearly $600,000 for the gold notes and were under an additional obligation to take and pay for another block of $560,000 of the same notes at 89; that on December 1, 1922, interest in the sum of about $220,000 on the gold notes then outstanding fell due, which the Oil Corporation was without funds to meet; that it was under these conditions that Cochrane (a director of the Refining Company) entered into negotiations with Smith and Chace of the Tanker Syndicate, Inc., for the purchase of the seven tankers; that as a result of the negotiations the Tanker Syndicate agreed to loan to the Refining Company $1,300,000 on a long-term payment, except as to $500,000, which was agreed to be shortly repaid; that this left $800,000 as the real intended loan by the Tanker interest; that at a meeting of the directors of the Refining Company, November 28, 1921, it was voted to approve the Tanker contract, to purchase 100,000 shares of the capital stock of the Oil Corporation, to pay it nearly $600,000 for the securities (worthless Cochrane and Harper securities), and also to pay it the difference between the $800,000 and the sum of the amounts paid for the stock and securities in consideration

of its guaranteeing the contract with the Tanker Syndicate, Inc.; that the treasurer of the Refining Company was authorized to deliver the (worthless) securities to Cochrane, Harper & Co., and to deliver the 100,000 shares of common stock to the Old Colony Trust Company in escrow, on such terms and arrangements as the treasurer might determine; that on the same date (November 28, 1921) the directors of the Oil Corporation authorized the Tanker contract and accepted the offer of the Refining Company for the purchase of the 100,000 shares of common stock and the (worthless) securities, and released Cochrane, Harper & Co. from their agreement of March 18, 1921, with reference to these securities, as having been complied with; that as a result of these transactions the worthless securities became the property of the Refining Company and were delivered to Cochrane, Harper & Co. without their assuming any obligation to pay or paying therefor; and that Cochrane, Harper & Co. were released from any obligation to take and pay for the remaining $560,000 of the gold notes, which they had previously obligated themselves to take and pay for; that Smith (a member of Peabody, Houghteling & Co.), Chace (a member of Chace Company), Palmer and Forbes were all participants in the transaction; and that as a result the Tanker Syndicate took over the financing of the enterprise in place of Cochrane, Harper & Co.

The District Court concludes from these facts that the vote to buy the Tankers for $17,271,000 amounted to bribing the controlling directors of the purchasing corporation (the Refining Company) to commit a gross breach of trust by turning over the bulk of the property of their corporations to the Tanker Syndicate (composed of Peabody, Houghteling & Co., Chace Company, and the Old Colony Trust Company); that the chief victim was the Oil Corporation (which owned the stock of the Refining Company) and the holders of its gold notes for over $5,000,000, the stock of the Refining Company being the chief asset of the Oil Corporation, to which the holders of the gold notes had to look for their pay; that the Tanker contract was fraudulent and unenforceable; that the Tanker Syndicate, Inc., knew that about $600,000 of the $1,300,000 to be advanced was to be used to bribe Cochrane and his associates to vote for the execution of the Tanker contract; that at the time of the reorganization Palmer, counsel for the noteholders' committee, and Hart and Forbes, two of its members, knew, or should have

known at the outset, that the original Tanker contract was obtained by fraud and was voidable; that Bacon, one of the court receivers, knew this, as did Chace, one of the managers of the Tanker Syndicate, and that the other members of the committee shortly knew, or should have known, that the contract was voidable because procured by fraud; that the original Tanker contract, unless voidable, was enforceable for the full amount of $17,271,000, and whether it was to be taken as it was written for $17,271,000, or to be taken as modified by the so-called "understanding" for $8,451,000, it was voidable; that the concealment of this voidability and its effect as a fraud upon the rights of the noteholders was the essence of the committee's undertaking and the gist of the present case; and that the committee adopted, concealed, and completed a scheme of fraud. The court also found that the receivership estate was solvent; that its stock in the Refining Company was worth at least $7,500,000, apart from its interest in the Venezuela oil fields, while the claims originally approved and allowed against the receivership estate were $6,500,000.

Having reached these conclusions the District Court dealt with what it termed "the nature and the scope of the remedy." As to that it says: This problem may be viewed from two aspects: (1) From the standpoint of the damage done the solvent receivership estate by the maladministration of the committee as quasi receivers of the estate, apparently assuming the proceeding to have been brought by the receivers, the legal representatives of the estate, against the committee; and (2) as a wrong done merely to the creditors now in court by the committee as fiduciaries, viewing the proceeding as one brought by creditors against the committee.

In this connection the court further states that the method of approach might be material as to whether the creditors could recover compensation for the large expenses incurred in the proceedings; that, if the proceedings were to be regarded as a suit by the creditors against their fiduciaries, their recovery might be held not to include their expenses for counsel fees and disbursements in the litigation, as costs do not include the real counsel fees of the prevailing party. It concludes that the decree should run on the theory first stated; that on that theory the damage to the receivership estate consisted of the loss to the Refining Company of the difference between the purchase price of the tankers (adopted by the committee at $8,451,000) and $3,000,000, which they were

worth, plus about $500,000 more improperly paid Smith and/or Chace for marketing the second mortgage bonds of the Refining Company, plus improper counsel fees paid to the attorneys for the committee, plus other minor items, an aggregate of $6,000,000; that, assuming this sum had been paid by the committee into the receivership estate, the expenses incurred by Wiltsee and the intervening creditors in restoring the estate and the expenses of its administration, would be a primary charge on the restored estate; but, as only a part of the creditors and none of the stockholders had sought relief in these proceedings, the damage collected should be limited to the amount of the claims of creditors now in court, plus expenses caused by the maladministration; that to hold otherwise with relation to the question of the expenses incurred would be to put a premium on wrongdoing by fiduciaries.

A question that goes to the foundation of the decrees of October 7–8—December 14, 1925, and May 15, 1926, here appealed from, is raised by assignments of error based upon the committee's exception to the allowance of the petition of July 31, 1925, nunc pro tunc as of May 8, 1924, or at any time. Counsel for Wiltsee contend that this exception was not seasonably taken, but the record shows that the exception was allowed on August 4, 1925, when the written motion—asking that the petition of July 31, to which it was attached, be allowed nunc pro tunc—was first brought to the attention of the court. At that time the exception was allowed in broadest terms. As previously pointed out, at the time the petition of July 31 was filed and allowed, the committee had made at least two reports of their conduct under the plan of reorganization, and the evidence oral and documentary, introduced at the various hearings on and after May 8, 1924, when Wiltsee's original petition was filed, had been completed. The theory on which the petition of July 31, 1925, was allowed nunc pro tunc as of May 8, 1924, is not disclosed. It may have been on the theory that it was an amendment of the petition of May 8, 1924; that the petition of May 8, 1924, was of such a nature that the petition of July 31st did not change its character, but simply made more definite the subject-matter alleged in that petition. If this is not so, the petition of July 31st was improperly allowed nunc pro tunc, for the reports of the committee and the evidence, documentary and oral, that had been introduced under the petition of May 8 was treated as though it had been introduced under the petition of July 31, 1925,

and is the evidence upon which the decrees of October 7–8—December 14, 1925, and May 15, 1926, are based. In fact the committee, though allowed to plead to the petition of July 31st, were not permitted to introduce any evidence in support of their pleas.

The committee contends that the nature and character of the proceeding invoked by the petition of July 31 was entirely distinct and different from that presented by the petition of May 8, 1924; that the nature and character of the proceeding set in operation by the latter petition was an investigation into their acts in carrying out the plan of reorganization; that it was not a proceeding in which the petitioner asked for relief or damages, but was simply and solely, as the petition itself discloses, an investigation or inquiry into "the details of said plan and the manner of carrying the same into effect * * * as bearing upon the value of the stock which your petitioner shall be asked to receive in the event that the Circuit Court of Appeals [in his suit against the receiver of the Oil Corporation] shall find him to be a creditor in any amount."

[1] The petition of May 8th cannot be regarded as an adversary proceeding of either an equitable or legal nature, for it makes no charges, and calls for no relief, nor for damages. It was simply the beginning of an investigation or inquiry into what was done under the reorganization plan for the purpose of ascertaining the value of the new preferred and common stock of the Refining Company to enable Wiltsee to determine whether he would take the new stock in satisfaction of his claim against the Oil Corporation, or whether he would pursue some other course that the investigation might disclose was to his advantage and interest. Not being an adversary proceeding, it could not properly be turned into one by amendment on the completion of the investigation, and it and the evidence taken under it made the basis of a decree or judgment for damages against the objection and exception of the committee.

The District Court in its opinion of April 28, 1926, in discussing the order contained in the decree of October 7–8, 1925, vacating or modifying the decree of February 17, 1923, approving the plan of reorganization, states that "Wiltsee's petition of May 8, 1924, expressly suggested such rescission or modification," and that the order contained in that decree was not initiated of its [the District Court's] own motion." In saying that the petition of May 8, 1924, "expressly suggested" the rescission or modification of the

decree of February 17, 1923, the District Court was clearly in error for the petition of May 8, 1924, contained no such suggestion, and asked for no relief. This action of the court, as disclosed by the record, was apparently taken at the suggestion of Wiltsee's counsel, made in a postscript to a letter (in the nature of a reply brief) addressed to the court under the date of August 26, 1925, after the oral arguments had been made and in the court's belief that the decree of February 17, 1923, approving the plan was, unless vacated, a bar to the action set out in the petition of July 31. In that postscript counsel said: "The noteholders' committee brief contains the proposition that the decree approving the plan is conclusive until set aside. While I doubt the soundness of this proposition, I think that, as a preliminary to the final decree, an order may properly be entered revoking the decree which approves the plan." It is certain, not only that the petition of May 8th did not ask rescission of the decree of February 17, 1923, or for any equitable relief, but that the petition of July 31 also did not. What the latter petition sought was damages against the committee. This being so, we still are of the opinion, as expressed in our decision in the mandamus proceedings, that the order rescinding or modifying the decree of February 17, 1923, contained in the decree of October 7–8, 1925, was entered of the court's own motion, for the suggestion contained in the postscript to counsel's letter can scarcely be regarded as a pleading in the case, on which to base a decree rescinding the decree of February 17, 1923.

The Wiltsee petition of March 13, 1925, as amended April 4, 1925, is the petition that introduced the Sherman Act investigation, which was carried along with the investigation instituted by the petition of May 8 until June 26, 1925, when the Sherman Act inquiry was put an end to, and all the evidence that had been taken in the meantime relating to it was stricken out. We regard that petition, and the proceedings under it, as the District Court evidently did, as stricken from the record and out of the case. It is certain that the decrees of October 7–8—December 14, 1925, and May 15, 1926, here appealed from, are in no way based upon it, but upon the petition of July 31, 1925.

The Wiltsee petition of July 28, 1925, was superseded by the petition of July 31, though not formally dismissed. It was never acted upon, and adds nothing to the case, whether dismissed or not.

The petition of July 31, 1925, differed from the one of July 28, only in that it was brought by Wiltsee in behalf of all creditors who might wish to join and bear the expense, as well as in behalf of himself. It asked for damages against the committee. It did not ask for rescission or modification of the decree of February 17, 1925, and contained no prayer for general relief. Nor did it ask that the noteholder creditors who might join therein, of which Wiltsee was not one, be allowed to rescind their debt settlements under the deposit agreement of November 15, 1922. The then acting receiver was not made a party plaintiff, and the petition contained no allegations that the receiver had been requested to join and declined (if that would have been of any consequence), or that any claim of the receivership estate against the committee had been assigned to Wiltsee so that he might sue in the name of the receiver for the benefit of the estate. At the close of the hearing of July 29, 1925, when various contentions relating to these matters were being advanced, the court said: "As it lay in my mind, I wondered, with the contentions that you [Mr. Whipple] were urging, that you did not ask leave to use the receiver's name for the purpose of restoring the status quo, so far as it could be restored; then anything brought into court as a result of those proceedings would go directly back in the court as part of the receivership res, and subject to be distributed to all parties who might appear and prove their claims. Now, it may be that your contentions do not result in any sound basis for any such pleading procedure as that." But this suggestion of the court was not followed, for the petition of July 31, 1925, was not brought in the receiver's name, but in Wiltsee's.

Although the petition of May 8, 1924, made no specific charges and did not ask for damages or equitable relief, Wiltsee's position would appear to be that the committee and their counsel "understood or were bound to understand" that it was a proceeding based on charges (though none were made), and asked for damages and/or equitable relief by way of rescission (though neither were asked for). To hold that the committee had or ought to have had such an understanding, and on it, as a pleading or basis for one, could be held responsible in damages, falls little short of saying that, when the committee came into court on the petition of May 8, 1924, they were not entitled to look to the petition for the charges, if any, that they would be called upon to answer and defend against, but were bound to

understand that every imaginable charge that might be preferred against them by Wiltsee or any creditor of the Oil Corporation was charged, and they would be held responsible in damages therefor, if the evidence introduced disclosed they had injured either or both in any way, and that any agreements or decrees that it might be necessary to rescind, before an allowance of damages could be awarded against them, was asked for and might be had. This is the situation presented by this case, and, to say the least, is a highly fanciful one, when contrasted with established rules for the conduct of litigation in a court of law.

But apart from this we are of the opinion that the record discloses that the committee and their counsel understood, and had the right to understand, from the date of the filing of the petition of May 8, 1924, to July 31, 1925, that the proceeding instituted by the petition of May 8 was an investigation, and that, if the matters disclosed in that investigation were such as justified Wiltsee in taking the preferred and common stock of the Refining Company in satisfaction of his claim, he would do so, and that, if they disclosed a situation warranting him in pursuing some other course, either with reference to the committee or any other party or parties who participated in carrying out the plan of reorganization, such course was open to him. But they clearly had no reason to understand that the petition of May 8th, on the completion of the testimony taken under it, was to be or would be permitted to be turned into an adversary suit nunc pro tunc as of May 8, 1924, and all the evidence taken during the investigation and without regard to its admissibility would be swept in and made use of as though it were clearly admissible, and as though it had been taken and admitted upon a complaint setting out definite charges and after an opportunity had been given to plead and defend in the usual manner.

The proceeding begun by the petition of May 8, 1924, from that date to the filing of the petition of July 31, 1925, was repeatedly referred to at the hearings by counsel for the petitioner and the court as an "investigation." At the hearing of April 1, 1925, counsel for Wiltsee in answer to objections made by the committee to their being obliged to make further report, on the ground that no charges had been preferred against them, said in substance that this was not a case in which charges were made and a complete framing of issues was necessary, as the committee were merely asked to come into court and report what they had done. And at the hearing of May 22, 1925, the same counsel stated: "This has been an investigation to see whether Mr. Wiltsee will come into the reorganization. This is not a suit in which Mr. Wiltsee attempts at all to assert his right to damages. He has a right to come in here and to examine the reorganizers, to see whether it was best for him to accept this stock, and that is all that he could do. That is all there is in this proceeding; and, as his honor has said, and as we all agree, no decree such as you suggest could be entered here." This statement of Wiltsee's counsel was never withdrawn and fairly represents the situation down to the time when the petition of July 31, 1925, was presented and the action of the court was had allowing it nunc pro tunc.

[2] We think the allowance of the petition of July 31, 1925, nunc pro tunc, as of May 8, 1924, with all the attendant consequences that the order implied, and to which effect was given, was not only highly prejudicial to the rights of the committee, but deprived them of that due 'process of law to which they were entitled and was error. Reynolds v. Stockton, 140 U. S. 254, 268, 270, 11 S. Ct. 773, 35 L. Ed. 464; Hovey v. Elliott, 167 U. S. 409, 17 S. Ct. 841, 42 L. Ed. 215; Windsor v. McVeigh, 93 U. S. 274, 23 L. Ed. 914; Gentry v. United States (C. C. A.) 101 F. 51; Matter of Sleeper, 251 Mass. 6, 146 N. E. 269; In re Rosser (C. C. A.) 101 F. 562; American Mills Co. v. Hoffman (C. C. A.) 275 F. 285; Standard Oil Co. v. Missouri, 224 U. S. 270, 281, 32 S. Ct. 406, 56 L. Ed. 760, Ann. Cas. 1913D, 936.

[3, 4] Furthermore, we are of the opinion that the proceeding to recover damages occasioned the receivership estate through the alleged fraud of the committee should have been brought by the receiver, in whom the right existed, and not by a creditor of the Oil Corporation, to whom the right did not belong and to whom it has never been assigned (Rochester Tumbler Works v. Mitchell Woodbury Co., 215 Mass. 194, 198, 102 N. E. 438; Wilson v. Welch, 157 Mass. 77, 80, 31 N. E. 712; Hayward v. Leeson, 176 Mass. 310, 325, 57 N. E. 656, 49 L. R. A. 725; Kelly v. Dolan [C. C. A.] 233 F. 635; Minchin v. Bank, 36 N. J. Eq. 436, 440; Klein v. Peter [C. C. A.] 284 F. 797, 799, 29 A. L. R. 1497) and that the proceeding, to confer jurisdiction on the court, should have been a plenary one at law or in equity, according to the nature of the relief sought; for the proceeding, whether at law or in equity, is not to recover property belonging

to the receivership estate in the possession of the committee, as no property of the estate is now or ever has been in the possession of the committee (Louisville Trust Co. v. Comingor, 184 U. S. 18, 22 S. Ct. 293, 46 L. Ed. 413; Weidhorn v. Levy, 253 U. S. 268, 40 S. Ct. 534, 64 L. Ed. 898; Harrison v. Chamberlain, 271 U. S. 191, 46 S. Ct. 467, 70 L. Ed. 897; Wood v. N. Y. & N. E. R. R. [C. C.] 61 F. 236), but is for a tort to recover damages occasioned the estate by the alleged fraud of the committee, in which case, unless it be made to appear that the remedy at law is inadequate, the proceeding would be an action at law (Whelan v. Enterprise Transportation Co. [C. C.] 164 F. 95; Buzard v. Houston, 119 U. S. 347, 7 S. Ct. 249, 30 L. Ed. 451; New York, etc., Co. v. Memphis Water Co., 107 U. S. 205, 210, 212, 213, 2 S. Ct. 279, 27 L. Ed. 484; City of Eau Claire v. Payson [C. C. A.] 109 F. 676, 678, 680; Carey v. McMillan [C. C. A.] 289 F. 380, 383; Kelley v. Gill, 245 U. S. 116, 121, 38 S. Ct. 38, 62 L. Ed. 185).

[5] But, whether the proceeding be brought on the equity or law side of the court, the District Court, as a federal court, would have jurisdiction over the controversy, as it would be ancillary to the original receivership bill. Whelan v. Enterprise Transp. Co. (C. C.) 164 F. 95, 98; Carey v. McMillan (C. C. A.) 289 F. 380, 383; Pope v. Louisville, New Albany & Chicago R. R., 173 U. S. 573, 19 S. Ct. 500, 43 L. Ed. 814; Hume v. New York (C. C. A.) 255 F. 488; Bond v. Brown (C. C. A.) 2 F.(2d) 797.

The decrees of the District Court are vacated, and the case is remanded to that court with directions to dismiss the proceeding, but without prejudice to the right of the parties concerned hereafter to bring such proceeding or proceedings of a plenary nature as they may be advised, with costs in this court to the appellants.